# CONNECTICUT v. JOHNSON

No. 81–927.   Argued October 13, 1982—Decided February 23, 1983

JUSTICE BLACKMUN, joined by JUSTICE BRENNAN, JUSTICE WHITE, and JUSTICE MARSHALL, concluded that the instructional error deprived respondent of "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," *Chapman* v. *California*, 386 U. S. 18, 23.   No matter how strong the prosecution's evidence, a reviewing court cannot find beyond a reasonable doubt that a *Sandstrom* error did not contribute to the jury's verdict.   A trial judge may not direct a jury to return a guilty verdict regardless of how overwhelmingly the evidence may point in that direction, and a conclusive presumption on the issue of intent is the functional equivalent of a directed verdict on that issue.   Respondent's jurors reasonably could have

interpreted the instructions as requiring a conclusive presumption on the issue of intent, an element of the crimes charged, leading them to ignore the evidence—including evidence relating to respondent's apparent defense that he intended to borrow rather than steal the victim's car and that he did not intend to kill the victim—in finding that the State had proved respondent guilty beyond a reasonable doubt. If so, a reviewing court cannot hold that the error did not contribute to the verdict, since the fact that the reviewing court may view the evidence of intent as overwhelming is irrelevant. While there may be rare situations in which the reviewing court can be confident that a *Sandstrom* error did not play any role in the jury's verdict—such as where, by raising a particular defense or by his other actions, the defendant himself has taken the issue of intent from the jury—such an exception, regardless of its boundaries, does not apply here. Pp. 81–88.

JUSTICE STEVENS concluded that no federal question was raised by the Connecticut Supreme Court's refusal to consider whether the *Sandstrom* error here was harmless and that therefore the writ of certiorari should simply be dismissed. However, because a fifth vote was necessary to authorize the entry of a Court judgment, he joined the disposition allowing the Connecticut Supreme Court's judgment to stand. Pp. 88–90.

BLACKMUN, J., announced the judgment of the Court, and delivered an opinion, in which BRENNAN, WHITE, and MARSHALL, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post,* p. 88. BURGER, C. J., filed a dissenting opinion, *post,* p. 90. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined, *post,* p. 90.

*Linda K. Lager,* Special Assistant State's Attorney, argued the cause for petitioner. With her on the brief was *John T. Redway,* Assistant State's Attorney.

*Jerrold H. Barnett* argued the cause for respondent. With him on the brief was *Jon C. Blue.*

JUSTICE BLACKMUN announced the judgment of the Court and delivered an opinion, in which JUSTICE BRENNAN, JUSTICE WHITE, and JUSTICE MARSHALL joined.

In *Sandstrom* v. *Montana,* 442 U. S. 510 (1979), this Court held that the Due Process Clause of the Fourteenth Amendment was violated by a jury instruction that "the law pre-

sumes that a person intends the ordinary consequences of his voluntary acts." *Id.*, at 512. We expressly left open in that case the question whether, if a jury is so instructed, the error can ever be harmless. *Id.*, at 526–527. Since *Sandstrom*, courts have taken different approaches to the harmless-error problem.[1] We therefore granted certiorari in this litigation to resolve the conflict. 455 U. S. 937 (1982).

## I

### A

Respondent Lindsay B. Johnson was accused in a four-count information of attempted murder, kidnaping in the second degree, robbery in the first degree, and sexual assault in the first degree. His jury trial in Connecticut Superior Court concluded with a verdict of guilty on all counts.

The evidence at trial revealed the following sequence of events: At approximately 11 p. m. on December 20, 1975, respondent and three male companions were in an automobile

---

[1] Several state and federal courts have assumed or held that *Sandstrom* errors may well be harmless, and have then gone on to decide whether the evidence of guilt was overwhelming. See, *e. g.*, *Lamb* v. *Jernigan*, 683 F. 2d 1332, 1342–1343 (CA11 1982), cert. pending, No. 82–5768; *Jacks* v. *Duckworth*, 651 F. 2d 480, 487 (CA7 1981), cert. denied, 454 U. S. 1147 (1982); *People* v. *Wright*, 408 Mich. 1, 30–32, 289 N. W. 2d 1, 10–12 (1980); *State* v. *McKenzie*, 186 Mont. 481, 533–535, 608 P. 2d 428, 458–459, cert. denied, 449 U. S. 1050 (1980). Other courts have taken a narrower view, holding that whether an unconstitutional presumption is harmless depends on whether intent was a disputed issue in the case. See, *e. g.*, *United States* v. *Winter*, 663 F. 2d 1120, 1144–1145 (CA1 1981), cert. pending, No. 81–1392; *McGuinn* v. *Crist*, 657 F. 2d 1107, 1108–1109 (CA9 1981), cert. denied, 455 U. S. 990 (1982); *Washington* v. *Harris*, 650 F. 2d 447, 453–454 (CA2 1981) (dictum), cert. denied, 455 U. S. 951 (1982); see also *People* v. *Thomas*, 50 N. Y. 2d 467, 477, 407 N. E. 2d 430, 436 (1980) (concurring opinion). Still other courts have suggested that *Sandstrom* errors can never be harmless. See, *e. g.*, *Hammontree* v. *Phelps*, 605 F. 2d 1371, 1380 (CA5 1979); *State* v. *Truppi*, 182 Conn. 449, 466, 438 A. 2d 712, 721 (1980), cert. denied, 451 U. S. 941 (1981). See also *Dietz* v. *Solem*, 640 F. 2d 126, 131 (CA8 1981).

in Norwalk, Conn. A young woman who had lost her way stopped her car and asked them for directions. Respondent offered to ride with her to show her the way. She agreed, and the two drove off. Respondent's companions followed in the other car.

When the woman reached a location familiar to her, she stopped and waited for respondent to get out of the car. Instead, respondent pulled her over to the passenger side of the car, and one of his companions entered on the other side and started to drive. The woman was told that the men needed a car. Shortly thereafter the second car was abandoned, and its two occupants got into the woman's car. The four men verbally abused her, threatened her with bodily harm, displayed a knife, and told her that the driver had a gun. The group stopped again in Norwalk to pick up a fifth man. During still another stop, one of the men placed a fully loaded, semiautomatic rifle in the trunk. When the woman asked the group to take the car and leave her alone, they replied that she would be given money and left near her home at the end of the evening.

The men then drove the car eastward on the Connecticut Turnpike to New Haven. Respondent, who is black, remarked that he had "never had a white woman before." Tr. 50, 262. The group arrived in New Haven in the early morning and stopped for gas. Respondent then directed the driver to a large apartment complex, where he pulled the woman from the car and into a lavatory on the first floor of the building. There, all five men sexually assaulted her.

When the woman was returned to the car, respondent bound her hands with telephone cord. Respondent told her that she would be left with a dime near a telephone booth so she could call home while they made their getaway. After directing the driver to a bridge, respondent pulled the woman out of the car and forced her to run with him to the middle of the bridge. They struggled and respondent threw her over the railing. She landed on a large pipe but jumped

into the river when she saw respondent pursuing her. She then eluded respondent by hiding under the bridge; she was able to untie her hands. She remained hidden for a while because she heard voices shouting, but eventually she sought refuge from the cold.[2] Shortly after 4 a. m., the residents of a nearby house admitted her when they heard her moaning, "please let me in . . . they were trying to kill me." *Id.*, at 390.

Relying on information provided by the woman, police arrested respondent and the other four men in Norwalk a few hours later. Two days thereafter, the victim identified all five from an array of 15 photographs. She also identified respondent in court,[3] describing him as the most vicious and violent of her assailants.

The defense theory, as indicated by the cross-examination of the State's witnesses,[4] apparently was that the woman had consented to travel with the group and to have sex with them, and that respondent did not plan to keep the woman's car or to kill her. For example, respondent's attorney asked the woman whether any mention had been made of going to a motel or having sex, whether she had consented to the sexual acts, and whether any of the men had said that the car would be returned in the morning with a full tank of gas. When the

---

[2] For the period between midnight and 4:30 a. m. on December 21, the National Weather Service in Bridgeport reported an air-temperature range of 23°–28° F, a wind-chill factor of —10° F, and a water temperature of 46° F. Approximately four inches of snow had accumulated from a snowfall that began on December 20.

[3] Respondent was tried alone. His companions were named in the information as coparticipants, but pleaded guilty to various charges before trial.

[4] Respondent did not testify at his trial. The defense called one witness, a detective who testified only about the accuracy of a stenographic transcription of a taped interview of the victim. The record does not reflect how the attorneys presented the facts to the jury in summation. Pursuant to Conn. Gen. Stat. § 51–61 (Supp. 1982), the arguments of counsel were not recorded.

woman stated that she was behind the wheel after the car became stuck in a snowbank on the turnpike, counsel asked how many of the men had got out of the car to push it or, indeed, whether all of them had done so. Cross-examination also revealed that when the woman went to the hospital on December 21, she told the examining physician that she had had sexual relations with her boyfriend the previous morning. According to the doctor, this might have accounted for sperm observed in gynecological tests. Finally, police descriptions of the bridge were arguably contrary to the victim's description of the area as "secluded."

## B

The trial court's charge to the jury began with general instructions on applicable principles of law. The jury was told to accept the court's pronouncements of the law but to be the sole judge of the facts. The court explained the presumption of innocence and the State's burden of proving the existence of every element of the crimes charged beyond a reasonable doubt. The court then described intent as

"a question of fact that is solely within your province as jurors. However, you should be aware of a rule of law that will be helpful to you and that is that a person's intention may be inferred from his conduct and every person is conclusively presumed to intend the natural and necessary consequences of his act." App. 22A–23A.

The court then gave specific instructions on the elements of each crime. With respect to attempted murder, the court again spoke of a conclusive presumption.[5] The charge on

---

[5] The specific charge on attempted murder was:

"Now, [no] one can look into a man's mind and see what his intention is. The only way to decide that question is to infer from the accused's conduct in the light of the surrounding circumstances. But as previously stated, every person is conclusively presumed to intend the natural and necessary consequences of his act." App. 25A.

The jury was told that if it believed the victim's testimony about respondent's conduct at the bridge, it might "presume [respondent] intended what

kidnaping in the second degree, on the other hand, referred to intent as "very largely a matter of inference."[6] The instructions on robbery in the first degree and sexual assault in the first degree did not contain any further discussion of intent. The charge concluded with a reminder as to the State's burden of proof and the jury's duty to base its verdict on the evidence presented and on the law given by the court.

## C

Respondent filed a timely appeal in December 1976, but because of problems with the reporter in obtaining a complete transcript the appeal was not briefed and argued until February 1981. In the interim, this Court decided *Sandstrom* v. *Montana*, 442 U. S. 510 (1979). Respondent argued on appeal that the "conclusively presumed" language in the jury instructions on intent rendered the instructions unconstitutional under *Sandstrom*.[7] The State argued that the error, if any, was harmless.

The Supreme Court of Connecticut affirmed respondent's convictions for kidnaping and sexual assault, but reversed

---

would be the natural and necessary consequences of his actions, under the prevailing circumstances and conditions; for example, the temperature of air and water and the force used against her person." *Ibid.*

[6] Specifically, the court stated:

"I have already instructed you that what a man's intention has been is necessarily very largely a matter of inference. . . . The only way in which you can determine in a case such as this what a man's intention was at any given time is by determining what his conduct was and what the circumstances were surrounding that conduct and from those infer what his intention was.

"As stated before, to draw such an inference is not only the privilege but also the duty of a juror provided, of course, the inference to draw is a reasonable inference." *Id.*, at 28A.

[7] Respondent also argued, unsuccessfully, that he was denied his right to self-representation and that the trial judge failed properly to instruct the jury on a defense to the kidnaping charge. These issues are not now before us, because respondent's own petition for a writ of certiorari was denied. *Johnson* v. *Connecticut*, 454 U. S. 1101 (1981).

the convictions for attempted murder and robbery on the basis of the instructions regarding intent.[8]   185 Conn. 163, 440 A. 2d 858 (1981).   In accordance with *Sandstrom*, the court analyzed the charge as a whole to determine how the jury might have interpreted it; the court balanced other portions of the charge against the challenged language essentially to determine whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp* v. *Naughten*, 414 U. S. 141, 147 (1973). The court first found that the general instructions were infirm, because the inferential language in that portion of the charge was not "sufficient to prevent the jury from interpreting the [conclusive] presumption in the way it was expressed to them."   185 Conn., at 171, 440 A. 2d, at 863.   The court then turned to the specific instructions "to determine whether the *Sandstrom* error in the general instructions was repeated, incorporated, or possibly cured by the specific language used." *Id.*, at 172, 440 A. 2d, at 863.

The specific instruction on attempted murder had repeated the erroneous-presumption language, so the court reversed respondent's conviction on that count. *Id.*, at 173, 440 A. 2d, at 863.   The kidnaping instruction, however, had been couched in the permissive language of inference.   Finding that this language had a "significant curative effect," *id.*, at 174, 440 A. 2d, at 864, the court affirmed respondent's kidnaping conviction.   With respect to the robbery count, the court refused to assume that the jury had applied the permissive inferences contained in the instruction on kidnaping, rather than the conclusive presumption earlier described as applicable to all the offenses.   It thus reversed that conviction. *Id.*, at 174–176, 440 A. 2d, at 864–865.   Finally, the

---

[8] Although respondent had not objected to the charge, the Connecticut Supreme Court accepted the issue for resolution on the merits under its "exceptional circumstances" rule expounded in *State* v. *Evans*, 165 Conn. 61, 69–70, 327 A. 2d 576, 581 (1973).   The decision on the merits is therefore properly before us. *Engle* v. *Isaac*, 456 U. S. 107, 135, n. 44 (1982); *County Court of Ulster County* v. *Allen*, 442 U. S. 140, 147–154 (1979).

court upheld respondent's conviction for sexual assault; it ruled that sexual assault was not a specific-intent crime, and thus that the jury was not influenced by the erroneous general instruction. *Id.*, at 176, 440 A. 2d, at 865.

The court did not discuss the State's argument that the *Sandstrom* violation was harmless, seemingly relying on its recent decision in *State* v. *Truppi*, 182 Conn. 449, 438 A. 2d 712 (1980), cert. denied, 451 U. S. 941 (1981).[9] In its petition for certiorari, the State claimed that the *Sandstrom* error should have been analyzed for harmlessness under *Chapman* v. *California*, 386 U. S. 18 (1967).[10]

## II

## A

In *Chapman*, this Court noted that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.*, at 23, and n. 8 (citing *Gideon* v. *Wainwright*, 372 U. S. 335 (1963) (right to counsel); *Payne* v. *Arkansas*, 356 U. S. 560 (1958) (coerced confession); *Tumey* v. *Ohio*, 273 U. S. 510 (1927) (impartial judge)). Resolving the question reserved three years earlier in *Fahy* v. *Connecticut*, 375 U. S. 85, 86 (1963), the Court held that some constitutional errors may be considered harm-

---

[9] In *Truppi* the court, citing *Chapman* v. *California*, 386 U. S. 18, 23 (1967), held that infringements of the rights at issue in *Sandstrom* can never be harmless because those rights are essential to a fair trial. 182 Conn., at 465, 438 A. 2d, at 721. That conclusion was based on federal rather than state law. This Court held in *Chapman* that whether a federal constitutional error can be harmless is a federal question. 386 U. S., at 21. State courts, of course, are free to interpret their own constitutions and laws to permit fewer applications of the harmless-error rule than does the Federal Constitution. See *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 81 (1980); *Oregon* v. *Hass*, 420 U. S. 714, 719 (1975); *Cooper* v. *California*, 386 U. S. 58, 62 (1967). We do not read *Truppi*, however, as having taken this approach.

[10] The State did not seek review of the Connecticut Supreme Court's decision that the charge as a whole was unconstitutional under *Sandstrom*. That issue, accordingly, is not before us.

less if the beneficiary of the error "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U. S., at 24. See also *Milton* v. *Wainwright*, 407 U. S. 371 (1972); *Harrington* v. *California*, 395 U. S. 250 (1969).

*Chapman* continued a trend away from the practice of appellate courts in this country and in England of "revers[ing] judgments for the most trivial errors." R. Traynor, The Riddle of Harmless Error 13 (1970) (hereafter Traynor). Even with the enactment of harmless-error statutes designed to eliminate reversals based on technical errors,[11] it was assumed well into this century that "automatic reversal was required in any case involving the violation of a right guaranteed by the Federal Constitution." Note, Harmless Error: The Need for a Uniform Standard, 53 St. John's L. Rev. 541, 544 (1979). Before that assumption was altered in *Chapman*, however, the Court had decided certain cases that remain instructive here.

In *Bollenbach* v. *United States*, 326 U. S. 607 (1946), the jury returned a guilty verdict just five minutes after receiving a supplemental instruction containing an improper presumption. This Court reversed the conviction, noting that to "say that the lay jury will know enough to disregard the judge's bad law if in fact he misguides them . . . would transfer to the jury the judge's function in giving the law and transfer to the appellate court the jury's function of measuring the evidence by appropriate legal yardsticks." *Id.*, at 613–614. The Court rejected the Government's contention that the error was harmless in view of the abundant evidence on the issue in question, stating:

> "This is to disregard the vital fact that for seven hours the jury was unable to find guilt in the light of the main

---

[11] The federal harmless-error statute provides: "On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U. S. C. § 2111.

charge, but reached a verdict of guilty under the conspiracy count five minutes after their inquiry was answered by an untenable legal proposition. It would indeed be a long jump at guessing to be confident that the jury did not rely on the erroneous 'presumption' given them as a guide. . . . [T]he question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts." *Id.*, at 614.

The following year the Court decided *Carpenters* v. *United States*, 330 U. S. 395 (1947). In that case the defendants, who were unions charged with conspiracy to violate the Sherman Act, unsuccessfully had requested an instruction that a union can be found guilty for its agents' unlawful acts only if the union actually participated in, authorized, or ratified the acts. This Court held that the requested instruction correctly stated the law, and refused to find the error harmless even though there was evidence showing the unions' participation in the conspiracy:

"[A] judge may not direct a verdict of guilty no matter how conclusive the evidence. There is no way of knowing here whether the jury's verdict was based on facts within the condemned instructions . . . or on actual authorization or ratification of such acts . . . . A failure to charge correctly is not harmless, since the verdict might have resulted from the incorrect instruction." *Id.*, at 408–409 (footnotes omitted).

B

We agree with the State that, in light of *Chapman*, these cases cannot be read for the broad proposition that instructional error of constitutional dimensions may *never* be harmless. This is not to say, however, that *any* form of instructional error should be analyzed for harmlessness. The question here is whether a charge that might reasonably

have been interpreted to require a conclusive presumption on the issue of intent may be considered harmless.

The Court consistently has held that "a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict . . . regardless of how overwhelmingly the evidence may point in that direction." *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564, 572–573 (1977); see *Carpenters* v. *United States*, 330 U. S., at 408; *Sparf & Hansen* v. *United States*, 156 U. S. 51, 105 (1895). And *Sandstrom* makes it clear, we think, that a conclusive presumption on the issue of intent is the functional equivalent of a directed verdict on that issue.

In *Sandstrom* the jury was instructed that "the law presumes that a person intends the ordinary consequences of his voluntary acts." 442 U. S., at 512. We held that instruction unconstitutional because a reasonable juror might have viewed it as creating a conclusive or burden-shifting presumption on intent. Rather than evaluating the evidence to determine if the State had overcome the presumption of innocence and proved beyond a reasonable doubt that the defendant had intended to kill, the jurors might have believed that, upon finding certain preliminary facts, "they were directed to find against defendant on the element of intent." *Id.*, at 523.[12]

The Supreme Court of Connecticut, in holding the charge at issue unconstitutional under *Sandstrom*, found that respondent's jurors, like Sandstrom's, reasonably could have interpreted the court's charge as a conclusive presumption on the issue of intent. Such an interpretation would have led them to ignore the evidence in finding that the State had proved respondent guilty beyond a reasonable doubt. For example, the jury conclusively could have presumed that respondent intended to kill the victim once it found that the

---

[12] The Supreme Court of Montana on the remand of *Sandstrom* found that the error was not harmless. *State* v. *Sandstrom*, 184 Mont. 391, 603 P. 2d 244 (1979).

natural consequence of his acts was to cause the victim's death. The jury thus would have failed to consider whether there was any evidence tending to cast doubt on this element of the crime of attempted murder, such as the victim's own testimony that she had been told she would be left near a phone booth at the end of the evening.

Because a conclusive presumption eases the jury's task, "there is no reason to believe the jury would have deliberately undertaken the more difficult task" of evaluating the evidence of intent. *Sandstrom*, 442 U. S., at 526, n. 13; see Note, Presumptive Intent Jury Instructions After Sandstrom, 1980 Wis. L. Rev. 366, 388.[13] Given the uncontroverted evidence of respondent's participation in the events that occurred on December 20 and 21, his most likely defense was that he intended to borrow rather than steal the car, and that he did not intend to kill the victim. The trial court's instruction removed this defense from the jury and directed it to find that the State had proved the intent element of the offenses.

An erroneous presumption on a disputed element of the crime renders irrelevant the evidence on the issue because the jury may have relied upon the presumption rather than upon that evidence.[14] If the jury may have failed to consider

---

[13] "The pivotal concept of *Sandstrom* is that the *possibility* that the jury reached its decision in an impermissible manner requires reversal even though the jury may also have reached the same result in a constitutionally acceptable fashion." Schmolesky, *County Court of Ulster County v. Allen* and *Sandstrom v. Montana:* The Supreme Court Lends an Ear but Turns its Face, 33 Rutgers L. Rev. 261, 272 (1981) (emphasis in original); see *id.*, at 295, and n. 193.

[14] Chief Justice Traynor notes in his monograph on harmless error: "In the absence of definitive studies to the contrary, we must assume that juries for the most part understand and faithfully follow instructions. The concept of a fair trial encompasses a decision by a tribunal that has understood and applied the law to all material issues in the case." Traynor 73–74 (footnote omitted). If a jury followed instructions it reasonably interpreted as calling for a conclusive presumption on the issue of intent, the jury would not consider the evidence on that issue.

evidence of intent, a reviewing court cannot hold that the error did not contribute to the verdict. The fact that the reviewing court may view the evidence of intent as overwhelming is then simply irrelevant.[15] To allow a reviewing court to perform the jury's function of evaluating the evidence of intent, when the jury never may have performed that function, would give too much weight to society's interest in punishing the guilty and too little weight to the method by which decisions of guilt are to be made. The Court in *Bollenbach* v. *United States*, 326 U. S., at 614–615, stated: "All law is technical if viewed solely from concern for punishing crime without heeding the mode by which it is accomplished." See *County Court of Ulster County* v. *Allen*, 442 U. S. 140, 160 (1979) ("[It is] irrelevant in analyzing a mandatory presump-

---

[15] Apparently, the dissent believes that a jury first evaluates the evidence of intent and *then* decides whether to apply the conclusive presumption; it assumes that the jury turns to the presumption only when the evidence is not overwhelming. Because we lack the dissent's confidence in predicting the sequence of a jury's deliberations, we find it impossible to conclude beyond a reasonable doubt that a conscientious jury, following its instructions, will evaluate the evidence of intent and reach a conclusion on that issue before considering the applicability of the conclusive presumption about which it has been instructed. As we note in the text, if the jury simply applies the presumption at the point in its deliberations when it has determined that the defendant committed the acts in question, it will have no need to consider the evidence of intent.

JUSTICE POWELL's dissent suggests that when "the character and quality" of the defendant's acts "are themselves dispositive of intent, the presumption becomes unnecessary to the jury's task of finding intent." *Post*, at 97. See also *post*, at 101 ("The jury, consistent with its instructions, could have regarded these facts as dispositive of intent and not relied on the presumption"). We agree that the presumption was "unnecessary" here, in the sense that the evidence was sufficient for a properly instructed jury to find that respondent acted with the requisite intent. A reviewing court cannot conclude beyond a reasonable doubt, however, that the jury based its finding of intent on that evidence. The jury might well have believed that respondent's acts, as a matter of law, were accompanied by the requisite intent.

tion . . . that there is ample evidence in the record other than the presumption to support a conviction").

There may be rare situations in which the reviewing court can be confident that a *Sandstrom* error did not play any role in the jury's verdict. For example, if the erroneous instruction was given in connection with an offense for which the defendant was acquitted and if the instruction had no bearing on the offense for which he was convicted, it would be appropriate to find the error harmless. See, *e. g., Hearn* v. *James,* 677 F. 2d 841, 843 (CA11 1982); *State* v. *Sheldon,* 301 N. W. 2d 604, 613 (N. D. 1980), cert. denied, 450 U. S. 1002 (1981). In addition, a *Sandstrom* error may be harmless if the defendant conceded the issue of intent. See, *e. g., Krzeminski* v. *Perini,* 614 F. 2d 121, 125 (CA6), cert. denied, 449 U. S. 866 (1980). See also *Washington* v. *Harris,* 650 F. 2d 447, 453–454 (CA2 1981), cert. denied, 455 U. S. 951 (1982). In presenting a defense such as alibi, insanity, or self-defense, a defendant may in some cases admit that the act alleged by the prosecution was intentional, thereby sufficiently reducing the likelihood that the jury applied the erroneous instruction as to permit the appellate court to consider the error harmless. See Traynor 73. We leave it to the lower courts to determine whether, by raising a particular defense or by his other actions, a defendant himself has taken the issue of intent away from the jury.[16]

Such an exception, regardless of its precise boundaries, does not apply here. Respondent did not concede the issue of intent with respect to either of the counts at issue. As noted above, the instruction was not "so ill-suited to both the theory on which the case was tried and the evidence that was presented," *United States* v. *Winter,* 663 F. 2d 1120, 1145 (CA1 1981), cert. pending, No. 81–1392, that it can be deemed harmless. The conclusive presumption the jury was

---

[16] We note that a defendant in a criminal trial is justified, of course, in defending solely in reliance on the presumption of his innocence and the State's burden of proof.

instructed to apply permitted the jury to convict respondent without ever examining the evidence concerning an element of the crimes charged. Such an error deprived respondent of "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman* v. *California,* 386 U. S., at 23.

The judgment of the Supreme Court of Connecticut is affirmed.

*It is so ordered.*

JUSTICE STEVENS, concurring in the judgment.

If federal constitutional error occurs in a state criminal trial, federal law places certain limits on the state appellate court's disposition of the case. If the error is sufficiently grievous, it *must* reverse.[1] If the error is less grievous, it also must reverse unless it declares its conviction beyond a reasonable doubt that the federal error was harmless.[2] But federal law does not *require* a state appellate court to make a harmless-error determination; it merely *permits* the state court to do so in appropriate cases.[3] This is all the Court held in *Chapman* v. *California,* 386 U. S. 18 (1967).

---

[1] See *Chapman* v. *California,* 386 U. S. 18, 23, n. 8 (1967).

[2] The harmless-error rule which may be applied when federal constitutional error has been committed, see *Chapman* v. *California, supra,* is not to be confused with either the federal harmless-error rule that is applied in federal courts when nonconstitutional error occurs, see *Kotteakos* v. *United States,* 328 U. S. 750 (1946), or with a State's own harmless-error rule applicable to errors of state law, see, *e. g.,* Conn. Gen. Stat. § 52–265 (1960).

[3] I recognize that the State has argued in this Court that the Federal Constitution *requires* the Connecticut Supreme Court to make a harmless-error determination in every case presenting a *Sandstrom* issue. Pet. for Cert. 7; Tr. of Oral Arg. 9–10. The following colloquy took place at oral argument:

"[Petitioner]: It appears that the Connecticut Supreme Court as a matter of federal constitutional law sometimes entertains the instruction—the challenge that the error was harmless and sometimes it does not. The only stated position that the Connecticut Supreme Court has given in this

In this case, the Connecticut prosecutor requested the Connecticut Supreme Court to declare that the *Sandstrom* error was harmless and that court refused to do so. That action does not even raise a federal question.[4]  I therefore would simply dismiss the writ of certiorari.  Because a fifth

regard is the one in State against Truppi, is that we sometimes apply the harmless error rule. . . .

"QUESTION: Well, is it your position that they must apply it in every case?

"[Petitioner]: No, Your Honor, my position is not that they must apply the harmless error rule in every case, but if the prosecution asks the Connecticut Supreme Court to review an error for its harmlessness as a matter of federal constitutional law, that it must at least use the harmless error test.

"QUESTION: Let me just state it to be sure I understand it correctly. As a matter of federal constitutional law, a state supreme court must entertain a harmless—must make a harmless error examination every time the prosecutor asks it to.

"[Petitioner]: In the context of an unconstitutional jury instruction, yes."

This position is so clearly erroneous that it does not merit the Court's review by writ of certiorari.

[4] No federal question arises when a state court has decided for itself that it will decline to apply the *Chapman* harmless-error test at all once it has found *Sandstrom* error.  That is all the Connecticut Supreme Court did in *State* v. *Truppi*, 182 Conn. 449, 466, 438 A. 2d 712, 721 (1980).  After discussing the guarantees afforded defendants by the reasonable-doubt standard, the court wrote: "Therefore we decline to weigh the evidence of guilt against the uncured damage done by the harmful portion of the instructions."  It cited two other State Supreme Court cases which had followed a different practice and noted that this Court had denied certiorari in one of them.  *Id.*, at 466, n. 12, 438 A. 2d, at 721, n. 12, citing *People* v. *Wright*, 408 Mich. 1, 30–32, 289 N. W. 2d 1, 10–11 (1980); *State* v. *Hamilton*, 185 Mont. 522, 539–542, 605 P. 2d 1121, 1131–1133, cert. denied, 447 U. S. 924 (1980).  In my view, the state court reversed for its own reasons.  Neither in *Truppi* nor in this case did it state or suggest that federal constitutional law compelled automatic reversal.

Whether the Connecticut court's refusal to review the evidence in this case was based on a decision to follow its earlier holding in *Truppi*, or on its own conclusion that the error in the case before it was not harmless, the holding does not even arguably violate any federal rule.

vote is necessary to authorize the entry of a Court judgment, however, I join the disposition which will allow the judgment of the Connecticut Supreme Court to stand.

CHIEF JUSTICE BURGER, dissenting.

I join JUSTICE POWELL's dissenting opinion, and write separately only to emphasize that the Court today does not adopt a rule of automatic reversal for *Sandstrom* error. Only four Justices would adopt a rule requiring reversal for *Sandstrom* error, whether harmless or not, in all cases. Such a rule is contrary to this Court's holding, with only one dissent, in *Chapman* v. *California*, 386 U. S. 18, 21–22 (1967), which rejected a rule of automatic reversal for all constitutional errors.

JUSTICE POWELL, with whom THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

Today a plurality of this Court finds that an instruction given in violation of *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), cannot be considered harmless except in certain "rare situations." The effect of the plurality's opinion, if it became a binding holding of the Court, would be to create an automatic reversal rule whenever a *Sandstrom*-type instruction is given, regardless of the conclusiveness of the evidence of intent. In my view, this is serious error.

I

It is necessary to address the jurisdictional issue raised in JUSTICE STEVENS' concurrence before considering the plurality's disposition of the merits. JUSTICE STEVENS would not reach the merits because the Connecticut Supreme Court, when requested to determine whether the *Sandstrom* error was harmless, declined to do so. Accordingly he concludes that no federal question is presented. It is unclear whether he takes the view that a state court may apply the federal harmless-error rule to provide a defendant with *greater* protection than *Chapman* v. *California*, 386 U. S. 18

(1967), would require or whether he finds that the State Supreme Court's refusal to consider this question rests on an independent and adequate state ground. In my opinion, each of these views is erroneous.

The harmless-error rule announced in *Chapman* was designed to establish the federal standard necessary "to protect people from infractions by the States of federally guaranteed rights." *Id.*, at 21. A State, of course, may apply a more stringent *state* harmless-error rule than *Chapman* would require. See *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 81 (1980). "But . . . a State may not impose such greater restrictions as a matter of *federal constitutional law* when this Court specifically refrains from imposing them." *Oregon* v. *Hass*, 420 U. S. 714, 719 (1975) (emphasis in original). Accordingly, if Connecticut wishes to impose a more stringent standard than the federal rule, it must do so as a matter of state law.

An examination of Connecticut cases establishes that the State has not taken this course. Connecticut has enacted a state harmless-error statute applicable only to errors of state law or procedure. See Conn. Gen. Stat. § 52–265 (1960); *State* v. *L'Heureux*, 166 Conn. 312, 323–324, 348 A. 2d 578, 584 (1974). The state rule is strikingly less stringent than the federal since it places the burden of proving that the error was "materially injurious" on the party who claims the trial court erred. Connecticut does not apply its state standard to federal constitutional error. It applies instead a federal rule. As the Connecticut Supreme Court explained in *State* v. *Coleman*, 167 Conn. 260, 355 A. 2d 11 (1974):

> "The usual rule is that the appellant bears the burden of establishing that an error was 'materially injurious' to him. General Statutes § 52–265; *State* v. *L'Heureux*, 166 Conn. 312, 323, 348 A. 2d 578. When, however, a federal constitutional error has occurred, the burden shifts to the state, and before the error can be held harmless, this court 'must be able to declare a belief that

it was harmless beyond a reasonable doubt.' *Chapman* v. *California*, 386 U. S. 18, 24 [1967], see also *State* v. *L'Heureux*, supra." *Id.*, at 278–279, 355 A. 2d, at 20 (footnote omitted).

The state court has adhered consistently to this distinction. See, *e. g.*, *State* v. *Cooper*, 182 Conn. 207, 212–213, 438 A. 2d 418, 421 (1980); *State* v. *Ruth*, 181 Conn. 187, 196–197, 435 A. 2d 3, 7–8 (1980); *Aillon* v. *State*, 168 Conn. 541, 547–548, 363 A. 2d 49, 53 (1975).

As both the plurality opinion and JUSTICE STEVENS note, the State Supreme Court did not address the State's argument in this case that the *Sandstrom* error was harmless. Its silence was based apparently on its decision in *State* v. *Truppi*, 182 Conn. 449, 438 A. 2d 712 (1980), where it held that *Sandstrom* error may never be harmless. *Truppi* therefore must be examined to determine whether the State intended to depart from its longstanding rule that it will apply a federal test to federal error.

*Truppi* prefaced its discussion of harmless error with a reference to the less demanding state harmless-error rule. See 182 Conn., at 465, 438 A. 2d, at 721. It then articulated the two classes of error recognized by *Chapman*, those errors that can never be harmless and those that can. 182 Conn., at 465, 438 A. 2d, at 721 (citing *Chapman, supra*, at 23). In its subsequent discussion, *Truppi* contrasted federal errors that "d[o] not significantly impair the truth finding function of the trial" with *Sandstrom* error. See 182 Conn., at 466, 438 A. 2d, at 721. It determined that the instructional nature of a *Sandstrom* error poses a risk that the jury will fail to consider the evidence and deprives a defendant of the protection afforded by requiring proof of guilt beyond a reasonable doubt. 182 Conn., at 466, 438 A. 2d, at 721. It is in this context that *Truppi* concludes "we decline to weigh the evidence of guilt." *Ibid.* It reasoned that to do so would constitute an invasion of the jury's function by an appellate

court. *Ibid.* (citing *Bollenbach* v. *United States*, 326 U. S. 607, 614 (1946)).

Thus, the Connecticut court in *Truppi* appears to have adopted—as the federal rule—the view that today's plurality seems to favor: *Sandstrom* error falls within that class of federal errors that can never be harmless.[1]   If one is to read *Truppi* otherwise, it is necessary to assume that Connecticut undertook an unannounced departure from its longstanding practice of applying the *Chapman* rule to federal constitutional error.   It also would require this Court to assume that having prefaced its harmless-error discussion with a reference to the less demanding state standard, the *Truppi* court then applied a more stringent state harmless-error rule than that announced in *Chapman*.   I decline to attribute such illogic to the Connecticut Supreme Court and agree with the plurality that Connecticut was applying its perception of federal constitutional law.   See *ante*, at 81, n. 9.   Accordingly, it is appropriate to consider the question presented—whether *Sandstrom* error may be harmless.

## II

In *Sandstrom* the trial court instructed the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts."   442 U. S., at 513.   The Court held that, where intent is an essential element of the crime, the giving of such an instruction is constitutional error.   As we noted, on finding only that Sandstrom had caused the victim's death and had acted voluntarily, the ju-

---

[1] In determining whether the Connecticut Supreme Court was applying federal or state law, it should be remembered that this Court has never held that a *Sandstrom* error inevitably requires reversal.   See *ante*, p. 88 (STEVENS, J., concurring in judgment).   Indeed, rather than foreclosing consideration of this federal issue, the *Sandstrom* Court remanded to allow the state court to make this determination initially.   See 442 U. S., at 526–527.   It would be consistent with our opinion in *Sandstrom* for the Connecticut Supreme Court to have undertaken this same federal inquiry.

rors "could reasonably have concluded that they were directed to find against [the] defendant on the element of intent." *Id.*, at 523. Alternatively, an instruction that was viewed as shifting the burden of persuasion to the defendant could lead to a similar error. The jury "could have concluded that upon proof by the State of the slaying, and of additional facts not themselves establishing the element of intent, the burden was shifted to the defendant to prove that he lacked the requisite mental state."[2] *Id.*, at 524.

The plurality today goes much further. It interprets *Sandstrom* as establishing that a conclusive presumption instruction on the issue of intent is the "functional equivalent" of a directed verdict on that issue. See *ante*, at 84. The plurality qualifies this categorical statement where "a defendant himself has taken the issue away from the jury"— *i. e.*, it would view the error as harmless only where "the defendant concede[s] the issue of intent." *Ante*, at 87. This is hardly an exception. Indeed, where intent to kill is conceded—as where self-defense is pleaded—there would be no occasion to give a *Sandstrom* instruction. The effect of the plurality's holding is that this type of instruction can never be harmless.

## III

In *Chapman* v. *California*, 386 U. S. 18 (1967), the Court rejected the argument that "all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful." *Id.*, at 21. It recognized that in the context of a particular case, some errors have little, if any, likelihood of affecting the jury's verdict. Accordingly, the proper inquiry is whether a court may say "beyond a reasonable

---

[2] Having found that the instruction violated due process, *Sandstrom* noted but left open the question of whether the error was harmless. It remanded for a determination of this issue by the Montana Supreme Court. See *ibid.* On remand, the court determined that the error was not harmless. See *State* v. *Sandstrom*, 184 Mont. 391, 392–393, 603 P. 2d 244, 245 (1979).

doubt that the error complained of did not contribute to the verdict obtained." *Id.*, at 24. In applying *Chapman*'s test, a court must assess the effect of the error in light of the facts of each case. See *Harrington* v. *California*, 395 U. S. 250, 254 (1969). For it is only by assessing the weight of the evidence against the defendant that the effect of the error on the jury's verdict can be judged. *Ibid.*

Today the plurality substantially limits *Chapman*'s harmless-error doctrine. It establishes a rule of automatic reversal because of the difficulty in determining the effect of a *Sandstrom* error on a jury's verdict. This difficulty, it reasons, derives from the error's instructional nature, particularly a perceived resemblance to a directed verdict. See *ante*, at 83–88. The analogy the plurality draws, however, between a conclusive *Sandstrom* instruction and a directed verdict is inapt. A directed verdict removes an issue completely from the jury's consideration. Such a presumption, by contrast, leaves the issue ultimately to the jury. A trial court's instructions are not limited to the presumption. A court also, as was done in this case, will charge that the defendant is presumed innocent and that the State must prove beyond a reasonable doubt each element of the crime—including the element of intent. See *infra*, at 101. In the context of these instructions, the presumption provides the jury only with one means by which the State's burden of persuasion may be satisfied.[3] See *Sandstrom*, 442 U. S., at

---

[3] Because a presumption does not remove the issue of intent from the jury's consideration, it is distinguishable from other instructional errors that prevent a jury from considering an issue. See *Jackson* v. *Virginia*, 443 U. S. 307, 320, n. 14 (1979) ("failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error"); *Carpenters* v. *United States*, 330 U. S. 395, 408–409 (1947) (failure to instruct jury on proper level of review not harmless); *Weiler* v. *United States*, 323 U. S. 606, 610–611 (1945) (erroneous instruction that perjury could be proved by uncorroborated oath of one witness not harmless). In *Bollenbach* v. *United States*, 326 U. S. 607 (1946), the Court found that the use of an erroneous presumption was not harmless. In that case, how-

518, n. 7.   While a jury may rely on the presumption instruc-
tion as a means of finding intent, there may be many cases in
which the facts and circumstances so conclusively establish
this element that the instruction is wholly superfluous.

The plurality seeks to justify its automatic reversal rule by
the view that a conclusive presumption permits a jury to con-
vict a defendant "without ever examining the evidence con-
cerning an element of the crimes charged." *Ante*, at 88.
While this accurately describes the effect of a directed verdict,
it misperceives the way a presumption instruction, conclusive
or otherwise, functions.   A presumption instruction informs
the jury that once a party has proved A, the basic fact, the
jury can or must presume B, the presumed fact.[4]   Contrary
to the plurality's assumption, a *Sandstrom*-type presumption
does not operate independently of the evidence.   The jury
must look to the evidence initially to see if the basic facts
have been proved before it can consider whether it is appro-
priate to apply the presumption.   In this case, for example,
the *Sandstrom* instruction was that "a person's intention may
be inferred from his conduct and every person is conclusively
presumed to intend the natural and necessary consequences
of his act."   App. 23A.   Thus, it was necessary for the jury

---

ever, the jury had deliberated for seven hours.   In response to a question
from the jury, the trial court delivered the erroneous presumption instruc-
tion, and the jury returned a verdict in five minutes.   This Court rejected
the argument that the error was harmless, not because a presumption may
never be harmless but because the course of events revealed graphically
that the error had affected the jury's verdict.   See *id.*, at 614.

[4] Although the term "presumption" often is used to describe a wide range
of procedural effects, a presumption typically refers to an evidentiary de-
vice that allows "the existence of one fact [to be] presumed from another."
See Jeffries & Stephan, Defenses, Presumptions, and Burden of Proof in
the Criminal Law, 88 Yale L. J. 1325, 1335 (1979).   *Sandstrom* makes
clear that the instruction in that case functioned in this fashion.   There we
observed that the presumption instruction allowed the jury to conclude
that the defendant possessed the requisite intent on the basis of facts that
would establish only criminal negligence.   See 442 U. S., at 523–524.

to look to the facts and circumstances to determine what respondent did—*i. e.*, to consider the character and quality of his acts—before it could define the natural and necessary consequences of those acts. If, however, these basic facts are themselves dispositive of intent, the presumption becomes unnecessary to the jury's task of finding intent. Because the presumption does not remove the issue of intent from the jury's consideration, it does not preclude a reviewing court from determining whether the error was "harmless beyond a reasonable doubt."[5] See *Chapman*, 386 U. S., at 24. See also *Lamb* v. *Jernigan*, 683 F. 2d 1332, 1342 (CA11 1982), cert. pending, No. 82–5768; *Jacks* v. *Duckworth*, 651 F. 2d 480, 487 (CA7 1981).

As indicated above, the effect of the plurality opinion is to create an automatic reversal rule whenever a *Sandstrom* instruction is given, regardless of the conclusiveness of the evidence of intent.[6] In so doing, the plurality disregards the

---

[5] In determining whether a *Sandstrom* error was harmless, the inquiry is not, as the plurality intimates, whether the presumption was unnecessary to the jury's verdict "in the sense that the evidence was sufficient for a properly instructed jury to find that respondent acted with the requisite intent." *Ante*, at 86, n. 15. Instead, the inquiry is whether the evidence was so dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption. See *infra*, at 101.

Despite this standard, the plurality reasons that the error always is harmful because it remains possible that a juror might have relied on the unconstitutional presumption rather than the evidence. This argument begs the question. In every harmless-error case, there is always a possibility that the error affected the jury's verdict. As has been noted: "Obviously, there will be trials in which the evidence supporting the inference to be drawn will be so persuasive that any additional prompting procured by the [unconstitutional presumption] must be regarded as inconsequential. In such cases, the validity of the presumption will be regarded as irrelevant because whatever error it might embody can be regarded as harmless." Jeffries & Stephan, *supra*, at 1388, n. 192.

[6] There is some facial ambivalence in the plurality opinion in this respect, as it expresses the view that a *Sandstrom* error may be harmless where "the defendant concede[s] the issue of intent." *Ante*, at 87. But the opin-

reasoning underlying *Chapman*'s rejection of such a rule. While agreeing that in some circumstances an error may be so fundamental that reversal is mandatory, Justice Black, writing for the Court, said:

> "We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an *automatic reversal* of their convictions and make further discussion unnecessary. We decline to adopt any such rule." 386 U. S., at 21–22 (emphasis added).

*Chapman* recognized that jury trials involve an infinite variety of "facts and circumstances." It therefore is hardly in the interest of a rational criminal justice system to adopt automatic and absolute rules that deprive courts of perhaps the single most important element of judging: the exercise of judicial discretion. Yet this is precisely what the plurality's opinion does. Its holding would require reversals of convic-

ion leaves no doubt that it has established an automatic rule of reversal. It concludes that *Sandstrom* error deprives a defendant of " 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.' " *Ante*, at 88 (quoting *Chapman* v. *California*, 386 U. S., at 23).

*Chapman*, however, makes clear that although some constitutional errors can never be treated as harmless, not "all trial errors which violate the Constitution automatically call for reversal." *Ibid.* The question—the one critical to the decision of this case—is in which category of error a *Sandstrom* instruction falls. In my view, it is not the type of error that invariably and "automatically" compels reversal. This is what the plurality today finds, subject to the rare situation in which the defendant "concedes" intent. The result of its opinion is to create a class of cases in which courts are deprived of their traditional discretion to see that both society and the defendant are treated justly. A *Sandstrom* error, however, is not comparable to an instruction that can never be harmless—for example, an instruction that fails to inform the jury that it must find guilt beyond a reasonable doubt. See n. 3, *supra*. The question of intent is one of fact and, as discussed in the above text, before a jury even reaches the presumption instruction it must find facts that are a predicate for the presumption.

tions in many situations in which the defendant's actions establish intent as conclusively as if it were unequivocally conceded. If, for example, an execution-style slaying occurred, in which the defendant tied up his victim and shot him repeatedly in the head, it would be clear beyond a reasonable doubt that the presence of a conclusive-presumption instruction would not have affected a jury's finding of intent.[7] The point is not that an execution-style slaying equals a concession of intent. It is instead that the plurality's limitation on the harmless-error doctrine fails to recognize that the impact of the presumption on the jury's verdict will vary with the facts and circumstances of each case.

## IV

Neither the respondent nor any of the four other participants in these crimes testified at the trial. The State's evidence—from the victim, the people who sheltered her after she escaped, the police, and the State's expert witnesses—was uncontradicted.[8] Reviewing this testimony, the Su-

---

[7] This hypothetical is not the unusual case. Numerous cases coming to this Court illustrate the frequency with which cases arise in which no rational person could doubt intent to murder. Although the recent cases cited below did not involve a *Sandstrom* error, they illustrate factual situations in which the Court's opinion would preclude the application of the harmless-error doctrine. See, *e. g., White* v. *State,* 415 So. 2d 719, 720 (Fla.) (members of motorcycle gang stabbed woman 14 times and slit her throat twice), cert. denied, 459 U. S. 1055 (1982); *Arango* v. *State,* 411 So. 2d 172 (Fla.) (defendant beat victim with a blunt instrument, wrapped a wire around his neck, stuffed a towel into his mouth, and shot him twice in head), cert. denied, 457 U. S. 1140 (1982); *State* v. *Mercer,* 618 S. W. 2d 1 (Mo.) (defendant strangled rape victim until his companion, who was monitoring her pulse, told him it had ceased), cert. denied, 454 U. S. 933 (1981).
There was no "concession" of intent to kill in any of these cases. Yet intent in each is clear beyond a reasonable doubt. If a *Sandstrom* instruction had been given in any of these cases, the plurality opinion today would preclude consideration of the harmless-error doctrine.

[8] The testimony of the only witness for respondent is irrelevant to the issue of intent.

preme Court of Connecticut found that the jury "could rea-
sonably have found the following facts":

"On December 20, 1975, at approximately 10:30 p. m.,
the female victim dropped her boyfriend off at the Nor-
walk railroad station and started to return to her home
in West Redding.   Unfamiliar with Norwalk, and in cold
and snowy weather, the victim lost her way.   While still
in Norwalk, she stopped her car and asked the occupants
of another automobile for directions.   The defendant,
one of the four men in this automobile, offered to ride in
her car to show her the way to route 7.   When her car
arrived at route 7, the defendant pulled the victim to the
passenger side of the car and another man from the
second automobile entered the victim's car and drove
it away.   The victim was told that the men needed
a car.[9]   She was threatened, at various times, with
bodily harm, was shown a knife and was told that there
was a gun.   Sometime later, while still in Norwalk, the
second car was abandoned and its other two occupants
entered the victim's car.   At another stop, a fifth man
was picked up.   Eventually, the car was driven on the
Connecticut Turnpike toward New Haven.   Sometime
in the early morning hours of December 21, 1975, the ve-
hicle was stopped near an apartment building in the New
Haven area.   The victim was forced into the build-
ing where she was sexually assaulted by all five men.
When the victim was returned to the car her hands were
bound with wire.   The car was driven to a bridge on
the New Haven-West Haven line where the defendant
forced the victim to run across the bridge.   At about the
midway point, she and the defendant struggled and he
threw her over the railing.   Initially she landed on a
pipe outside of the railing, but jumped into the river and

---

[9] When respondent took the victim's automobile, he said: "We need a car,
we are going to take your car and you are going to come with us."   Tr. 37.
He kept the car until he was arrested by the police.

went under the water when the defendant pursued her. She managed to elude him by hiding under the bridge. Sometime later she made her way to a nearby residence from which the police were called. The defendant and others were arrested in Norwalk between 5 and 6 a. m. the same morning in or near the victim's car." 185 Conn. 163, 165–166, 440 A. 2d 858, 860 (1981) (footnote added).

On these facts, a reviewing court might well say beyond a reasonable doubt that the jury found the presumption unnecessary to its task of determining intent. With respect to the charge of robbery, the uncontradicted evidence was that respondent stated: "We need a car, we are going to take your car . . . ." His actions confirmed his unequivocal statements: he overpowered the woman, took her car and never returned it. One would think that intent to rob could not have been clearer. The evidence of respondent's intent on the attempted murder charge could be viewed as only marginally less compelling. Having participated in a gang-type rape of this woman, respondent bound her hands with wire and threw her into an icy river in the middle of December.

The jury, consistent with its instructions, could have regarded these facts as dispositive of intent and not relied on the presumption. As indicated above, the court instructed the jury that the State had the burden of proving intent beyond a reasonable doubt. It stressed that "[t]he State, in other words, can sustain the burden resting on it only if the evidence before you establishes the existence of every element constituting the crime charged beyond a reasonable doubt." App. 17A. Indeed, it prefaced the conclusive-presumption instruction by stating that intent is a question of fact solely within the province of the jury.[10] See *id.*, at

---

[10] The Connecticut Supreme Court held that the *Sandstrom* error was not cured by the remainder of the instructions. See 185 Conn. 163, 172–176, 440 A. 2d 858, 863–865 (1981). The correctness of that decision is not before us.

22A–23A.   Although the instructions left the issue of intent to the jury, the plurality finds that neither we nor the state courts may assess the effect of the presumption on the jury's verdict.   It imposes instead an automatic reversal rule that would be applicable even when proof of intent to murder is established beyond any doubt.   See n. 6, *supra*.   Such a rule is precisely what *Chapman* rejected.

## V

For the reasons stated, I think this Court properly could decide the question of harmless error.   Normally, however, this is a question more appropriately left to the courts below.   The Connecticut Supreme Court did not address the question, nor has it been briefed extensively here.   There may be facts and circumstances not apparent from the record before us.   I therefore would reverse the judgment and remand the case for consideration of whether the error was harmless beyond a reasonable doubt.