**William SPRANGER, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 684S216.**

Supreme Court of Indiana.

Oct. 15, 1986.

**932**

Terrance W. Richmond, Milan, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

DICKSON, Justice.

Defendant-Appellant William Spranger was charged with murder, I.C. § 35–42–1–1. The State also requested the death penalty, alleging as the aggravating circumstance that the murder victim was a law enforcement officer acting in the course of duty, I.C. § 35–50–2–9(b)(6)(i). After a change of venue from Noble to Wayne County, a Wayne Circuit Court jury convicted defendant of murder, and during the penalty phase found that the death penalty should be imposed. The trial judge sentenced defendant to death.

Restated, the following issues are raised on this direct appeal:

1. whether the trial court erred in denying defendant's several requests for continuance;

2. whether the trial court erred in denying defendant's request for a list of witnesses specifically expected to testify;

3. whether the trial court erred in refusing to appoint a defense sociologist;

4. whether the trial court erred in admitting various exhibits;

5. whether the trial court erred in admitting evidence of crimes committed by defendant in the course of events which led to the instant crime;

6. whether the trial court erred in denying motions for a jury view of the crime scene and for a weapon demonstration;

7. whether the trial court erred in giving its Final Instruction No. 8;

8. whether the evidence was sufficient to sustain the verdict of murder;

9. whether the trial court erred during the penalty phase of the trial in limiting the testimony of a defense witness;

10. whether I.C. § 35–50–2–9 fails to accord due process of law in that it does not require a finding that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt before the death penalty may be imposed; and,

11. whether imposition of the death penalty in this case is contrary to law.

We affirm the conviction and death sentence.

During the early morning hours of May 28, 1983, defendant, then 18 years old, and one Allen Snyder were driving from Fort Wayne to Avilla, in Noble County. Nearby residents observed them vandalizing an automobile, and one called Avilla Town Marshal William Miner. Marshal Miner drove to the scene, apprehended the two men and called for assistance. A struggle between the marshal and Snyder quickly ensued during which the marshal's service revolver was knocked either away from his hand or out of its holster onto the highway. Defendant crossed the highway, picked it up and fatally shot Marshal Miner in the back. Defendant and Snyder were eventually arrested. Defendant led officers to a small lake where he had discarded the revolver and flashlight. Snyder was allowed to plead guilty to involuntary manslaughter and given a prison term. Defendant later claimed that Snyder shot Marshall Miner. However, in addition to Snyder's testimony, the State presented evidence of at least four admissions by the defendant that he, not Snyder, fired the shot, and the State presented unrefuted expert medical testimony that the bullet, fired from some distance, entered the marshal's back. We review specific testimony in somewhat more detail in our discussion of Issue VIII below.

## ISSUE I

◼ Defendant emphatically contends that he was denied both a fair trial and the effective assistance of counsel because the trial court refused several requests for a continuance, and failed to timely appoint co-counsel and provide additional investigatory and secretarial personnel. Defendant was arrested May 31, 1983. On June 1, 1983, the Noble County public defender was appointed to represent him. On June 10, 1983, defendant's motion for appointment of co-counsel was denied. Following a change of venue, the Wayne Circuit Court set trial for November 1, 1983. Thereupon defendant again moved for the appointment of co-counsel. On October 7, 1983, the trial court appointed co-counsel to assist and approved funds for investigative and secretarial assistance. On October 13, 1983, the trial court denied defendant's motion for continuance, and moved the beginning trial date forward one day, to October 31, 1983. Defendant again moved for continuance, claiming the need for additional time to investigate and prepare.

With respect to defendant's claim that the denials of his motions for continuance deprived him of a fair trial, we disagree. The granting of continuances is subject to the trial court's sound discretion. *Smith v. State* (1985), Ind., 475 N.E.2d 27; *Kimball v. State* (1985), Ind., 474 N.E.2d 982; *Rhinehardt v. State* (1985), Ind., 477 N.E.2d 89. Our review of the record fails to disclose any abuse of discretion or resulting inadequacy of representation.

Defendant contends that a showing of prejudice is unnecessary when insufficient time results in a denial of the right to counsel. However, we are not persuaded that the trial court failed to afford adequate time.

Finding no abuse of discretion nor denial of rights to counsel and to fair trial, we do not find error upon this issue.

## ISSUE II

◼ Defendant contends he was denied a fair trial by the trial court's denial of defendant's motion to require the State to disclose specific trial witness information. Defendant's "Motion to Produce Evidence" filed June 8, 1983, requested extensive discovery, including the "names and last known addresses of all persons whom the State of Indiana intends to use in the prosecution of this cause of action, and the

names and last known addresses of persons known to the State of Indiana to have knowledge pertinent to this cause of action or who were interviewed but who will not be used as witnesses by the State of Indiana herein." The State's response, filed June 15, 1983, asserted that it had not determined which individuals it would call as witnesses, but submitted a list of persons the State "may call as witnesses". In its response, the State acknowledged that the list was incomplete. Responding to other discovery requests, the State provided the defense with copies of 26 statements of potential witnesses, and offered to make other statements available upon request. The list of potential witnesses contained the names of over 170 persons. Hardly any addresses were given, but a majority of the names were followed by a telephone number.

By September 26, 1983, the prosecutor had indicated to counsel for defendant that the State would call approximately 30 witnesses. However, the record does not indicate whether or not the identity of these persons had been disclosed. On September 26, 1983, defendant filed a motion requesting a transcript of bail reduction hearings scheduled to occur September 29 and 30. Thirty-three witnesses testified at said hearing, twenty-six of whom were included in the State's original list of potential witnesses. On October 7, 1983, the court granted defendant's motion for a transcript of the bail proceedings. The record does not reflect when the transcripts were received by defense counsel. On Thursday, October 27, 1983, with the trial scheduled to begin the following Monday, defendant filed a "Motion for Specification" requesting that before 9:00 a.m. on the beginning day of trial, the State be ordered to furnish defense counsel with the following:

1. the names, addresses and telephone numbers of each and every witness to be called as such for trial in this cause;

2. an exact description of each and every exhibit, and its present location and custodian, to be used as such for trial in this cause; and,

3. an exact description and designation of each photograph to be used as an exhibit, including a copy of same to be provided to defense counsel if it has not already been provided.

In its entry denying the motion, the trial court stated:

The Court requests the parties to cooperate and the State to the extent possible to give some indication as to witnesses who will actually be called so that the defendant may prepare for such witnesses and also have some idea as to when to be ready to present any defense.

The error urged by defendant is that the trial court failed to require the State to specifically disclose which witnesses the State would be calling for trial. Defendant contends that in ruling upon the motion, the court had but two choices: either to order the requested discovery, or to grant a continuance.

In cases of violation of discovery orders, a continuance has been held as a proper remedy unless the State's action is so misleading or demonstrates such bad faith that exclusion of evidence is necessary to protect the defendant's fair trial rights. *Crenshaw v. State* (1982), Ind., 439 N.E.2d 620. However, the trial court would be granted discretion in determining whether there has been substantial compliance with discovery. *Allen v. State* (1982), Ind., 439 N.E.2d 615.

We are not directed to, nor do we find, any indication in the transcript that defendant filed a motion to compel discovery, or in any other manner objected to the adequacy of the State's initial response to defendant's discovery request for identification and information regarding the State's potential trial witnesses. Defendant has not complained, and does not now assert, that the State violated any discovery order. He merely contends that the trial court should have required the additional discovery.

Trial courts are granted wide latitude in matters concerning discovery. *Opfer v. State* (1985), Ind., 482 N.E.2d 706; *Kalady v. State* (1984), Ind., 462 N.E.2d 1299. Absent clear error and resulting prejudice, a

trial court discovery ruling will not be overturned. *Opfer, supra; Wagner v. State* (1985), Ind., 474 N.E.2d 476.

The question is not whether the court abused its discretion in choosing between a continuance or exclusion to remedy a discovery violation. No such violation is alleged. The question is whether the court abused its discretion in refusing to require additional discovery. The trial court's order was not erroneous, and there is no indication of resulting prejudice. The trial transcript reveals that the defense counsel appeared well prepared, and was not surprised by the testimony of the State's witnesses. We find no error upon this issue.

## ISSUE III

■ Defendant contends the trial court's denial of his motion to employ a sociologist at public expense deprived defendant of a fair trial and effective assistance of counsel. Defendant's motion requested the assistance of a private sociologist to assist in the evaluation and proof of mitigating circumstances in any death penalty phase of trial, to evaluate defendant's ability to understand the proceedings and assist counsel in investigation, to assess and identify potential motive, bias, or prejudice of State's witnesses, and to assist in voir dire.

The trial court had previously granted defendant's motion for funds to employ a private psychiatrist, and also granted defendant's motion seeking public funds for secretarial services, to employ a private investigator and ballistic/firearms expert, and to employ additional counsel.

Recently facing a similar issue, this Court in *Wisehart v. State* (1985), Ind., 484 N.E.2d 949 recognized that an accused is not constitutionally entitled at public expense to whatever expertise desired. Rather, the matter is one for the sound discretion of the trial court. *Wisehart* upheld a murder conviction and death penalty notwithstanding the trial court's refusal to appoint a sociologist, where there was no showing of particular need nor resulting prejudice.

In support of his motion for a sociologist, the defendant submitted a memorandum consisting of a paper entitled "Examining Death Qualification: Further Analysis of the Process Effect" by Professor Craig Haney, University of California, Santa Cruz. Professor Haney's paper focuses upon the process and effect of death qualification during the voir dire.

Defendant's brief cites numerous authorities generally supporting the proposition that an indigent defendant's constitutional rights may require that he be provided with expertise and logistical support beyond appointed counsel. Notwithstanding the validity of such considerations, the reasonable necessity of such requests must be subject to the discretion of the trial judge.

Defendant's contention is tantamount to asserting that a trial court should be obligated to provide public funds for whatever expertise and trial preparation assistance might be requested by a capital defendant. The list of requests would be limited only by counsel's imagination. Such a policy would invite trial delays under the guise of such requests, and would consume a great portion of the public funds. The determination as to what is reasonably necessary must therefore rest with the trial judge.

The defendant's request was thus evaluated by the trial judge here in light of the purposes for which it was sought, the argument set forth in Professor Haney's article, and along with the court's awareness of the other expertise and trial preparation assistance which had already been granted to the defendant at public expense. The record fails to demonstrate any abuse of discretion by the trial court's refusal to grant defendant's motion for a sociologist.

## ISSUE IV

Defendant contends the trial court committed reversible error in admitting several exhibits including photographs of the crime scene, photographs of the victim, a crowbar found at the scene, and the marshal's service revolver because of alterations in its appearance after it was recovered.

■ State's Exhibit 3 was a photograph generally showing the crime scene shortly after the incident; State's Exhibit 4 was a photograph depicting the marshal's body at the scene. Defendant argues these photographs should not have been admitted because "items at the scene had been moved" before the officer who took the photographs arrived. The only evidence of an "object" being "moved" at all pertinent to this objection was that a nearby resident had pulled the marshal out of the drainage ditch and attempted to give him assistance. The jury was informed that exhibit 3 depicted the scene of the crime at the time the photograph was taken, not at the precise moment of the incident. Photographs depicting the scene of a crime are competent and relevant in assisting jurors in orienting themselves and understanding the evidence, and will be admissible if they are a true and accurate representation of the things they are intended to portray. *Bray v. State* (1982), Ind., 430 N.E.2d 1162. State's Exhibits 3 and 4 easily met this test.

■ Defendant then argues that the admission of State's Exhibit 4 along with the admission of other photographs of the marshal's body, resulted in the presentation of cumulative evidence of the victim intended only to inflame the passions of the jury. We do not agree.

Exhibit 4, as noted, was a photograph of the marshal's body at the scene. Exhibit 9 was an identification photograph of the marshal's face before the autopsy. Exhibit 10 showed the wound in the officer's back; exhibit 11 showed the wound through his abdomen. Dr. Ramsey, the State's expert medical witness, used the latter photographs to explain his conclusion that the marshal had been shot in the back. State's Exhibits 26 and 27 also illustrated the wounds in the marshal's back and abdomen respectively, and were introduced during Dr. Ramsey's rebuttal testimony. Dr. Ramsey used these photographs to buttress his prior testimony that Marshal Miner had been shot in the back, and rebut

defendant's contention Snyder shot the marshal during their struggle.

This Court explained in *Richardson v. State* (1985), Ind., 476 N.E.2d 497, 500:

Such photographs are admissible if they provide relevant evidence and their relevance is not outweighed by their tendency to inflame and impassion the jury against the defendant. The question necessarily becomes one of balancing these concerns, and thus the trial court has broad discretion in determining whether such photographs should be admitted in a particular case. (Citations omitted.)

Defendant further argues the trial court erred in admitting into evidence State's Exhibit 13, a crowbar found at the scene. Defendant contends the jury might have inferred "it was used by a person assisting the killer, to threaten or injure the victim when in fact it was not." This argument is entirely speculative, as there was no evidence the marshal was injured by anything except the fatal shot. The crowbar was found near the second automobile which defendant and Snyder vandalized. The State presented evidence, discussed in Issue V below, that the pair used the crowbar in vandalizing the automobiles they found parked next to the highway. The second incident led to the shooting.

■ An exhibit is admissible as relevant and material when it bears some relevance to this defendant and the transaction from which the criminal charge arises. *Golden v. State* (1985), Ind., 485 N.E.2d 51. Exhibit 13 was relevant and material, and we find no error in its admission.

■ Defendant finally challenges the admission into evidence of State's Exhibit 23, the marshal's service revolver, which police officers, with defendant's assistance, recovered from a small lake where he had discarded it after the incident. Defendant argues the revolver should not have been admitted because officers who tested it cleaned and polished it, thereby changing its appearance. Defendant suggests that cleaning the revolver would have eliminat-

ed scratches caused when it was knocked away from the marshal and scraped along the pavement. The jury was informed the revolver was cleaned before it was tested, and there is no question the exhibit was the marshal's service revolver and was the murder weapon. Any alteration in the revolver's appearance was a matter of evidentiary weight, not admissibility.

## ISSUE V

Defendant argues that the trial court erred in admitting evidence that he and Snyder vandalized an automobile before they started to vandalize the automobile at the scene of this crime. He contends that "[t]he prior vandalizing of a Ford Mustang automobile by Spranger adds nothing to the story of the shooting of William Miner." The State claims that this evidence was admissible under the *res gestae* exception to the general rule that evidence of a defendant's prior crimes should not be admitted.

This Court recently stated in *Forehand v. State* (1985), Ind., 479 N.E.2d 552:

> While evidence that a defendant has committed other crimes generally is not admissible to prove the specific crime charged, such evidence may be admitted under various exceptions to this general rule, including the *res gestae* exception. Under the *res gestae* exception evidence may be introduced which completes the story of the crime by proving its immediate context, even if this evidence also shows that the defendant committed other crimes during the course of the charged offense. *See, Blankenship v. State* (1984), Ind., 462 N.E.2d 1311, 1313 and authorities cited. Admission of evidence under the *res gestae* exception generally is left to the sound discretion of the trial court. *Id.*, 462 N.E.2d at 1313.
>
> \* \* \* \* \* \*
>
> This Court has upheld the admission of evidence of transactions leading to the crime charged, even if the evidence concerned acts outside of the immediate time frame of the charged offense, pro-

vided that such evidence otherwise meets the requirements of the *res gestae* rule. *See, e.g., Altman v. State* (1984), Ind., 466 N.E.2d 716, 720.

479 N.E.2d at 554, 555. The record here shows that defendant and Snyder were driving toward Avilla until the two men stopped to vandalize a Mustang automobile. This incident began the sequence of events leading to the vandalizing of the second automobile, when Marshal Miner was called to the scene. The first vandalism was one of the transactions in a continuous series leading to the shooting. The trial court did not abuse its discretion by admitting this evidence.

## ISSUE VI

Defendant claims the trial court abused its discretion and committed reversible error in denying his motions for a jury view of the scene of the crime and for an in-court weapon demonstration of the marshal's revolver.

The trial court overruled the request for jury view of the scene on the basis such view would not greatly assist the jury and because of the cost and inconvenience of transporting the jury to the scene. Responding to a similar contention this Court stated in *Carroll v. State* (1982), Ind., 438 N.E.2d 745, 749:

> It is within the trial court's discretion whether to allow a view. It is not a substantive right nor essential to a fair trial. A jury's view of a location is not intended as evidence. It is intended simply to aid the jury in understanding the evidence. Thus, a trial court does not abuse its discretion if the viewing would not be materially helpful to the jury or where photographs or other evidence adequately present the situation. (Citations omitted.)

*Accord, Pinkerton v. State* (1972), 258 Ind. 610, 615–16, 283 N.E.2d 376, 379–80 and authorities cited. In this case defendant generally contends that had the jury been allowed to view the scene, they could have gained helpful insight into the eyewitness-

es' testimony. Having carefully reviewed their testimony, and also noting that the witnesses were allowed to refer to a chart depicting the scene, we are unable to conclude that the view would have been materially helpful to the jury. Defendant was not denied a fair trial by the refusal of the request for a jury view.

■ Defendant also contends the trial court erred in refusing to allow an in-court weapon demonstration of the marshal's revolver. We disagree.

While a criminal defendant is protected by the due process requirements of being allowed to confront the witnesses against him and to present material and relevant evidence from witnesses on his own behalf, *see* Ind. Const. Art. I, §§ 12, 13, the trial court, in order to make sure the trial proceeds in an orderly manner, is given substantial latitude in ruling on the admissibility of evidence. *See, e.g. Connell v. State* (1984), Ind., 470 N.E.2d 701, 704. The trial court is accorded wide discretion in ruling on the admission of expert testimony, especially where, as here, such testimony would be tangentially relevant to the material issues in the case. *See, Dougherty v. State* (1983), Ind.App., 451 N.E.2d 382, 385.

Defendant asserts that a weapon demonstration would have assisted the jury's evaluation of the eyewitnesses' testimony concerning who fired the shot. However, defendant does not specify the ways in which the jury's understanding of the testimony would have been enhanced. While such tests might be appropriate in another case, for example where the firing rate of two different weapons is being compared to illustrate which was used in a crime, we cannot conclude defendant was denied a fair trial because a weapon demonstration was not allowed in this case.

### ISSUE VII

■ Defendant argues the trial court committed reversible error in giving its Final Instruction No. 8. He claims the instruction impermissibly shifted the burden of proof to him on the issue of criminal intent, or *mens rea.*

The instruction in pertinent part stated: [W]hether an act is done "knowingly" or "intentionally" may be *inferred* from and established by all the facts and circumstances attending the act complained of, or otherwise bearing upon or related to such act, as disclosed by the evidence, if the facts and circumstances support such an *inference.* Men's purposes are often revealed by their acts, and whether an act is done "knowingly" or "intentionally" may be *inferred* from the alleged act itself, if established by the evidence, taken into consideration with all of the facts and circumstances surrounding or related to such act, as disclosed by the evidence, if the jury should determine such an *inference* should be drawn. (Emphasis supplied.)

Defendant relies on *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, and its progeny.

In *Sandstrom* the trial court instructed the jury, without qualifying language, that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." 442 U.S. at 513, 99 S.Ct. at 2453, 61 L.Ed.2d at 44. The Supreme Court held the instruction violated the defendant's due process rights in that the jury could have interpreted it to mean once the state presented evidence the defendant's acts were voluntary, the burden of production or even persuasion shifted to him to prove he was not acting with the requisite *mens rea.* The Court concluded that the instruction thus violated its holding in *In Re Winship* (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, that the State bears the burden to prove each element of the charged crime beyond a reasonable doubt. Since *Sandstrom,* similar instructions have been condemned in at least two cases. *See Francis v. Franklin* (1985), 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344; *Connecticut v. Johnson* (1983), 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823. However, the *Sandstrom* Court emphasized that, regarding the finding of criminal intent from vol-

**940**

untary acts, the jurors "were not told that they had a choice, or that they might *infer* that conclusion; they were told only that the law presumed it." 442 U.S. at 515, 99 S.Ct. at 2454, 61 L.Ed.2d at 45 (emphasis supplied); *see also id.*, 442 U.S. at 527–28, 99 S.Ct. at 2461, 61 L.Ed.2d at 53 (Rehnquist, J., concurring).

This Court has applied *Sandstrom* in several cases, but not found reversible error. In *Van Orden v. State* (1984), Ind., 469 N.E.2d 1153, 1160–61, *cert. denied* (1985), 471 U.S. 1104, 105 S.Ct. 2335, 85 L.Ed.2d 851, and *Jacks v. State* (1979), 271 Ind. 611, 623–26, 394 N.E.2d 166, 174–76, the trial court gave instructions suggesting that intent could be presumed from voluntary acts, but the instructions were qualified by other language properly instructing the jury on the State's burden of proof. In *Kiper v. State* (1983), Ind., 445 N.E.2d 1353, 1358–59, and *Davidson v. State* (1982), Ind., 442 N.E.2d 1076, 1080–81, however, the trial courts properly instructed the juries that intent could be *inferred* from voluntary acts.

The challenged instruction in the instant case, as in *Kiper* and *Davidson*, properly informed the jury that criminal intent could be *inferred* from the defendant's acts. Thus, the *Sandstrom* rule was not violated and we find no error.

### ISSUE VIII

Defendant contends the evidence presented by the State was not sufficient to sustain the verdict. The evidence is sufficient where the probative evidence, and the reasonable inferences therefrom which support the verdict, would enable a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt. *Case v. State* (1984), Ind., 458 N.E.2d 223; *Loyd v. State* (1980), 272 Ind. 404, 407, 398 N.E.2d 1260, 1264, *cert. denied* 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105.

As defendant and Snyder drove toward Avilla from Fort Wayne, they vandalized one automobile parked next to the highway and took some stereo equipment and cas-

sette tapes. They passed another automobile just before they entered Avilla, turned around and came back to it. As they started to vandalize the second automobile they were observed by Barbara Pries Egley from her residence nearby. She called Marshal Miner, who came to the scene. He ordered the two men to place their hands on the hood of one of the automobiles parked there, then started to call for assistance. As he did so, Snyder and defendant exchanged places, and the marshal and Snyder were exchanging words by this point. Defendant then pushed Snyder into the marshal or Snyder attacked him.

Defendant took the marshal's flashlight from the patrol car and waved several automobiles by as the struggle continued. However, the marshal and Snyder wrestled onto and across the pavement, such that an automobile driven by one Christopher Gaff could not pass by and stopped at the scene. The struggle continued to the other side of the pavement, toward a drainage ditch, and the marshal gained the upper hand. However, he lost his service revolver as he attempted to draw it, or it may have been knocked out of its holster. As the struggle continued, the marshal was shot and slid into the drainage ditch. Defendant yelled to Snyder, "let's get the hell out of here, I shot the bastard." Mr. Gaff, Mrs. Egley, and her mother, Bessie Arnett, who also lived in a residence near the scene, observed the struggle, heard the shot, and saw Marshall Miner slide into the ditch. Snyder and defendant rapidly drove away. Mrs. Arnett's husband pulled the marshal out of the water and called for help on the patrol car radio. The marshal died before medical assistance arrived. Defendant and Snyder drove to a private residence, where defendant spoke with his brother, and admitted shooting "a cop in the back." The brother observed that Snyder had a large pistol and defendant had a police flashlight. After Snyder fired the remaining rounds in the revolver, defendant threw the pistol and flashlight into nearby Summit Lake, where these items were eventually recovered.

Sixteen-year-old Tina Hakey was awake when defendant and Snyder arrived at her residence between 4:00 and 4:30 a.m. after the killing. She testified, and maintained over vigorous cross-examination, that defendant then stated:

I shot him but I don't feel guilty because it was like somebody stepped inside of me, pulled the trigger and then stepped back out.

The State also presented testimony from three of defendant's cellmates, who testified that defendant, on several occasions, had repeated essentially the same story of the shooting: the marshal attempted to draw his revolver as he struggled with Snyder, Snyder kicked it or otherwise knocked it away, defendant then picked it up and shot Marshal Miner in the back.

Contrary to defendant's argument, the quantity of probative evidence here distinguishes the present case from *Chew v. State* (1985), Ind., 486 N.E.2d 516; *Ritchie v. State* (1963), 243 Ind. 614, 189 N.E.2d 575; *Thomas v. State* (1958), 238 Ind. 658, 154 N.E.2d 503; *Penn v. State* (1957), 237 Ind. 374, 146 N.E.2d 240; and, *Zinn v. State* (1981), Ind.App., 424 N.E.2d 1058. In *Penn,* we reversed a conviction where the uncorroborated testimony of the prosecuting witness was "so improbable and incredible that no reasonable man could say that appellant's guilt had been proved beyond a reasonable doubt." 237 Ind. at 382, 146 N.E.2d at 243. *Ritchie* and *Thomas* reversed convictions resulting from identification testimony which was inherently inconsistent with undisputed facts and unsupported by circumstantial evidence of guilt. Similarly, it was held in *Zinn* that where the State's case is based wholly on circumstantial evidence, any resulting reasonable inference of guilt "must be more than mere suspicion, conjecture, conclusion, guess, opportunity, or scintilla." 424 N.E.2d at 1060 (citation omitted). Clearly, the evidence reviewed above distinguishes the present case from those based solely upon circumstantial evidence, or resulting from mere suspicion, conjecture, conclusion, or guess.

Defendant argues that the testimony supporting conviction is outweighed, as a matter of law, by the "eyewitness" testimony from Mr. Gaff, Mrs. Egley, and Mrs. Arnett, each of whom testified as to their conclusion that the shot was fired by the man (Snyder) actually fighting with Marshal Miner. A careful review of the testimony compels rejection of this argument. Mr. Gaff's attention was riveted upon the fight between Snyder and Marshal Miner, which was illuminated by the headlights of the Gaff vehicle. Mr. Gaff was barely aware of the existence of the third person (Spranger) at the scene. Mr. Gaff did not see a gun, nor did he observe any flash when he heard the sound of a shot. His surmise that Snyder shot Marshal Miner was apparently based upon his observation of the marshal's arm being extended out toward Snyder at the time of the shot. Mrs. Egley observed the events from over two hundred feet away. She did not observe any weapon, but at the time of the shot, she saw Marshal Miner's hands on Snyder's shoulders, with Snyder having one hand against the marshal's chest. Mrs. Arnett was watching from a distance of about three hundred feet. At the time she heard the gunshot, she saw Snyder and Marshal Miner facing each other, with the marshal's hands on Snyder's shoulders, and with Snyder having one arm on the marshal's shoulder and the other hand extended toward his abdomen. Mrs. Egley's belief that Snyder fired the fatal shot was apparently based upon her perception that the flash at the time of discharge seemed to appear as if between Snyder and Marshal Miner. However, she did not observe the gun. Contrary to the testimony of Mr. Gaff, both Mrs. Egley and Mrs. Arnett insisted that no other motorist was present.

In contrast to the conjecture of these witnesses regarding the source of the shot, the undisputed fact remains that Marshal Miner, while facing Snyder, was shot in the back from a distance further away than point blank range, without any bullet penetration of the front of his clothes. When considering all the evidence, including the

testimony of Snyder and the hearsay testimony regarding the defendant's own admissions, we conclude that it is clearly sufficient to support the jury's conclusion that the defendant fired the fatal shot.

In his dissent to this opinion, Justice DeBruler contends that because the murder of Avilla Town Marshal Miner occurred outside the town limits of Avilla, the evidence was insufficient to prove the aggravating circumstance that the victim was a law enforcement officer acting in the course of duty. The dissent would hold that, unless in pursuit of the perpetrator of an "in-town" crime, a town marshal has no power to arrest outside the town limits. We disagree.

A town marshal's powers to arrest are set forth in Ind. code § 36–5–7–4, which provides in pertinent part that a marshal:

has the powers *of other law enforcement officers* in executing the orders of the [town] legislative body and *enforcing laws.* The marshal or his deputy:

(2) shall arrest without process all persons who commit an offense within his view[.] (Emphasis supplied)

The predecessor statute, Ind. Code § 18–3–1–32, provided that town marshals "shall possess all the common-law and statutory powers of constables[.]" These powers were found in Ind. Code § 17–4–36–5, a codification of statutes dating back to 1852, granting constables the "power to act throughout their respective counties, unless specially restrained by law[.]" The dissent contends that, in enacting section 36–5–7–4, the legislature intended to restrict the authority of town marshals as compared to their "former" authority under section 18–3–1–32. However, we find that in 1979, Ind. Code § 17–4–36–5, defining the powers of constables, was repealed *and not replaced.* Acts *1979*, Pub. Law 160, § 1. As of that point, the language in section 18–3–1–32, referring to "statutory powers of constables" had no referent because the statute defining the power of constables had been repealed. Accordingly, when the legislature thereafter redefined the powers of town marshals in Ind.

Code § 36–5–7–4, and prescribed the powers of town marshals by reference to powers granted to other police agencies, the new statute referred to town marshals having the powers of *"other"* law enforcement officers.

Ind.Code § 35–33–1–1 provides in pertinent part:

A *law enforcement officer* may arrest a person when:

(2) He has probable cause to believe the person has committed ... or is committing ... a felony[.] (Emphasis supplied)

This provision is analogous to Ind. Code § 34–4–32–2 which states:

Whenever a law enforcement officer believes in good faith that a person has committed an infraction or ordinance violation, he may detain that person[.]

The latter statute was reviewed by the Court of Appeals in *State v. Russ* (1985), Ind.App., 480 N.E.2d 248, 250–51:

The above statute clearly states that a law enforcement officer may, at any time, detain a person suspected of committing an infraction. It does not state any jurisdictional limitation on the authority of law enforcement officers (including city police officers) to detain (or stop) individuals for committing infractions.

The decision upheld the authority of a city police officer to make a lawful traffic arrest outside his city limits and inside those of a nearby city. Ind. Code § 35–33–1–1, like § 34–4–32–2, contains no territorial limitation.

Since the recodified statute defining the powers of town marshals refers to powers of other law enforcement officers, and as the powers of those officers to arrest are not given territorial limitation in sections 34–4–32–2 and 35–33–1–1, we cannot accept the dissent's contention that the legislature, in granting town marshals the powers of those other officers in section 36–5–7–4, intended to restrict their authority. With the office of constable abolished, Ind. Code § 36–5–7–4, in basing town marshals' au-

thority on powers granted other law enforcement officers, has maintained the well-established historical power of town law enforcement officers to effect arrests outside the town for felonies committed within their view. In the instant case, we find that Marshal Miner was therefore acting in the course of duty when he was murdered, and thus the evidence demonstrated the existence of the aggravating factor charged.

## ISSUE IX

 Defendant argues that the death sentence must be vacated because the trial court limited the testimony of a defense witness during the penalty phase of the trial. The trial court's rulings were correct.

The defense introduced the testimony of one Lloyd McClendon, who at one time was sentenced to death for murder in New Mexico but later achieved a substantial education, was pardoned for his prior offenses and, as of this trial, was working for the Ohio Department of Corrections. The trial court refused to allow Mr. McClendon to testify regarding (1) his personal experience of being rehabilitated, (2) his knowledge of the experiences of 12–15 other former death row inmates now leading successful lives, and (3) his personal views concerning the deterrent effect of capital punishment. The trial court did allow Mr. McClendon to testify that, based on his brief personal interview with defendant, he had some hope that defendant could be rehabilitated. The trial court otherwise concluded that the proffered testimony was irrelevant. Specifically, the court held that the testimony regarding the rehabilitation of Mr. McClendon and other former death row inmates would not tend to prove that this defendant was amenable to rehabilitation. Regarding Mr. McClendon's opinion of the deterrent effect of capital punishment, the court ruled that such was a broad policy consideration for the legislature in adopting a death penalty statute, not for a jury in a particular murder case.

Defendant correctly argues that I.C. § 35–50–2–9(c)(7), and the United States Supreme Court's opinions in *Eddings v. Oklahoma* (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, and *Lockett v. Ohio* (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (plurality opinion), require the trial court to consider any *relevant* mitigating evidence in a death penalty case. However, the defendant is not given carte blanche to introduce any evidence or opinion testimony concerning the death penalty. As Chief Justice Burger noted in *Lockett:*

> Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.

438 U.S. at 604, n. 12, 98 S.Ct. at 2965, n. 12, 57 L.Ed.2d at 990, n. 12 (plurality opinion).

Other authorities cited are distinguishable or inapplicable. To whatever extent *California v. Ramos* (1983), 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171, and *Barclay v. Florida* (1983), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134, support the obvious proposition that the jury's moral judgment is invoked in determining the death sentence recommendation, they do not hold that proffered general testimony concerning the death penalty must be admitted. In *Barefoot v. Estelle* (1983), 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090, reh. den. 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185 the trial court allowed testimony from two psychiatrists, based on hypothetical questions, that the defendant would be a continuing danger to society if allowed to live. The Supreme Court's opinion supports the view that if the State presents hypothetically-based psychiatric testimony of future dangerousness, the defendant should be allowed to counter with evidence generally attacking the reliability of the psychiatric testimony.

Among other cases cited by defendant here or at trial, *Green v. Georgia* (1979), 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (per curiam) involved only a trial court's refusal to admit, during the penalty phase

of a death penalty trial, hearsay evidence that the co-defendant had admitted that he, alone, shot the victim. The Supreme Court held such testimony should, as a matter of due process, have been admitted over the state's hearsay rule. In *Moore v. Commonwealth* (1982), Ky., 634 S.W.2d 426, 434–35, the Supreme Court of Kentucky found, among several other problems with the trial, that the trial court had erred in refusing to allow testimony from a minister regarding the rehabilitative potential of the *particular defendant on trial.* Mr. McClendon was allowed to give such testimony here. The opinions in *Ross v. Hopper* (1977), 240 Ga. 369, 240 S.E.2d 850, *cert. denied* (1978), 435 U.S. 1018, 98 S.Ct. 1890, 56 L.Ed.2d 397, a Georgia state habeas corpus case, and *State v. Pierre* (1977), Utah, 572 P.2d 1338, *cert. denied* (1978), 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194, state that general testimony concerning the efficacy of capital punishment was introduced in those cases. Neither opinion can reasonably be construed to *require* trial courts to admit such testimony.

In this case the State relies on *Wisehart* where, in rejecting essentially the same contention, we stated:

> The question of whether or not it is appropriate in our society to provide for the death penalty in certain cases is one to be answered by the legislature. The issue to be decided by a trial jury is whether the sentence is appropriate for the particular offense and the particular offender. (Citation omitted.) ... *Lockett* referred to evidence directly on point regarding the defendant and a particular crime at issue before the jury. The testimony proposed by Defendant in the instant case through the two witnesses was not evidence of the type presented in *Lockett,* but represented only general philosophical opinions regarding penalties approved by our State Legislature.

484 N.E.2d at 957. In this case Mr. McClendon's proffered general testimony that death row inmates may be rehabilitated and his views regarding the deterrent effect of capital punishment would not have been relevant to the jury's individual consideration of *this* defendant's capacity for rehabilitation and whether he should otherwise be sentenced to death.

Since the filing of the parties' briefs, the United States Supreme Court has decided *Skipper v. South Carolina* (1986), — U.S. ——, 106 S.Ct. 1669, 90 L.Ed.2d 1, reversing a death sentence for failure to admit evidence of the petitioner's future adaptability to prison life. At the sentencing hearing, the defendant was prohibited from presenting testimony of a witness to testify that the defendant had been a well-behaved and well-adjusted prisoner, from which the jury could have drawn favorable inferences regarding the defendant's character and probable future conduct if sentenced to life in prison. The United States Supreme Court held that evidence of a particular defendant's adjustability to life in prison "unquestionably goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination[,]" — U.S. at ——, n. 2, 106 S.Ct. at 1672, n. 2, 90 L.Ed.2d at 8, n. 2, particularly where the prosecutor, in seeking the death sentence, emphasized the dangers which defendant would pose to other inmates if sentenced to prison. The Court concluded:

> The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.

— U.S. at ——, 106 S.Ct. at 1673, 90 L.Ed.2d at 9. Unlike the instant case, the *Skipper* decision focused upon the improper exclusion of mitigating evidence directed toward the individual defendant's personal tolerance for prison life and proclivity for rehabilitation. Neither the *Skipper* decision nor its rationale lend support for defendant's contention here that defendant was entitled to present evidence regarding the susceptibility of other persons to rehabilitation.

We find no error upon this issue.

ISSUE X

▮ In attacking certain instructions given by the trial court during the penalty

phase, defendant raises a familiar challenge to a procedural aspect of our death penalty statute. He contends that, as a matter of due process, the jury must find that the aggravating circumstances outweigh the mitigating circumstances *beyond a reasonable doubt* before they can recommend the death penalty. Defendant's argument, in effect, would also require the trial judge, in imposing sentence, to conclude the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt before the death penalty could be imposed.[1]

This Court rejected essentially the same argument in *Moore v. State* (1985), Ind., 479 N.E.2d 1264 (DeBruler, J., dissenting on other grounds), *cert. denied* —— U.S. ——, 106 S.Ct. 583, 88 L.Ed.2d 565. There the Court stated:

> The State concedes that the United States Constitution protects an accused against criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, (1970) 397 U.S. 358, 364, 25 L.Ed.2d 368, 375, 90 S.Ct. 1068, 1073. In *Daniels* [*v. State* (1983), Ind., 453 N.E.2d 160], we found that Ind.Code § 35–50–2–9(g) complies with the proscription articulated in *Winship* since the State must prove *beyond a reasonable doubt* the existence of at least one of the enumerated aggravating circumstances. Moreover, we specifically decided upon Appellant's argument as follows:
>
> > "However, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt, but is a balancing process."
>
> *Daniels*, 453 N.E.2d at 171. Appellant now suggests that this language was *dicta* because *Daniels* involved a jury trial in which the jury was instructed to follow the "beyond a reasonable doubt"

standard in finding the existence of aggravating factors and in the weight determination implicit in the requisite balancing process. Notwithstanding this distinction, we expressly adopt the language of the above quoted passage from *Daniels* and hold that it is constitutional to not require a finding that aggravating factors outweigh mitigating circumstances beyond a reasonable doubt. (Emphasis in original.)

*Moore*, 479 N.E.2d at 1281. Because our prior decisions in *Moore* and *Daniels* are applicable, we find no error upon this issue.

### ISSUE XI

Defendant raises several challenges to imposition of the death penalty in this particular case. We discuss them under the general heading of whether imposition of the death sentence here was contrary to law. We conclude it was not.

■ Defendant argues the death sentence is "disproportionate" in view of the reduced charge and prison term given Snyder. He also contends that the death penalty request initially should have been dismissed for the same reason.

We disagree. The evidence established that the marshal was killed by one shot in the back from his service revolver. There is no evidence Snyder and defendant planned any killing before the marshal arrived on the scene. There is no evidence they planned, together, to use deadly force against the marshal once he apprehended them. In other words, there is no evidence the two men participated equally in the killing. Rather, the record shows one of the pair gained control of the service revolver and fired it. For reasons discussed previously the jury properly could have and did conclude that this was the defendant. We reject the argument that Snyder's involvement in this crime was "proportional." The United States Supreme Court has re-

---

1. The trial judge in this case did state in his sentencing memorandum that he found the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, though he did not regard this as a factual finding, and emphasized he saw no compulsion to apply that standard.

cently held that the Eighth Amendment forbids imposition of the death penalty on one who aids and abets a felony in which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force be employed. *See, Enmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140. Snyder did not entertain any intent to kill the marshal or attempt to do so. Under *Enmund* we might well have been constrained to vacate a death sentence on Snyder under the facts here.

The United States Supreme Court recently refused to impose a strict "proportionality" requirement under the Eighth Amendment. *Pulley v. Harris* (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29. We followed *Pulley* in *Burris v. State* (1984), Ind., 465 N.E.2d 171, 192, *cert. denied* (1985), 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809, and determined that even though we do not apply a strict "proportionality" requirement in reviewing death sentences, our review satisfied the strictures of *Pulley* and other United States Supreme Court cases. In *Resnover v. State* (1984), Ind., 460 N.E.2d 922, *cert. denied*, 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160, we held that the discretion given prosecutors to file or not file for the death penalty does not offend the Constitution because "subsequent procedure dictated by statute prevents the arbitrary and capricious infliction of a death penalty." *Id.*, 460 N.E.2d at 929. The reduced charge and prison sentence given Snyder in this case did not require the death penalty information against defendant be dismissed, nor does it provide any basis for vacating defendant's death sentence.

■ Defendant next contends that the trial judge disregarded the mitigating evidence entirely or, if he did consider the evidence, did not accord it sufficient weight. To the contrary, the trial court's sentencing memorandum, attached as an appendix to this opinion, demonstrates the court did consider the mitigating evidence, but found the mitigating factors did not outweigh the aggravating factors. *Cf., Lowery v. State* (1985), Ind., 478 N.E.2d 1214, 1232, *cert. denied* (1986), — U.S. ——, 106 S.Ct. 1500, 89 L.Ed.2d 900 (Prentice, J., concurring) (trial court's comments showed the court did not deem proffered evidence mitigating, not that trial court failed to consider such evidence.)

■ Defendant particularly emphasizes the trial court's failure to consider his youth a mitigating factor, and cites us to *Dillon v. Duckworth* (7th Cir.1984), 751 F.2d 895, *cert. denied* (1985), 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859. There the Seventh Circuit Court of Appeals granted a writ of habeas corpus to an Indiana petitioner who had been sentenced to death for crimes committed when he, like defendant, was only 18 years old. At sentencing the state trial judge had refused to consider age a mitigating factor because the "capability of such cruelty (brutal stabbings during a burglary) in the mind of one that age cannot be considered a mitigating circumstance." 751 F.2d at 901, n. 7. In contrast, the trial judge's findings in this case revealed that he considered defendant's youth as a potentially mitigating factor, but not of substantial weight because of the nature of the killing. However, we cannot conclude that he refused to consider age a mitigating factor.

In considering defendant's contentions that the trial court did not give adequate weight to the mitigating factors presented, we incorporate our own review of whether the death penalty is appropriate under the facts and circumstances of this case. In the course of this review we consider two guidelines.

■ First, Rule 2 of the Indiana Rules for the Appellate Review of Sentences provides that the reviewing court will not revise a sentence authorized by statute unless such sentence is manifestly unreasonable in light of the nature of the offense and character of the offender. A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and

offender for which such sentence was imposed.[2]

Second, in terms of the factors which may be considered and the weight given them we are guided by *Zant v. Stephens* (1983), 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, as subsequently discussed and applied in *Davis v. State* (1985), Ind., 477 N.E.2d 889, *cert. denied* — U.S. ——, 106 S.Ct. 546, 88 L.Ed.2d 475. In his review of the Georgia statutory scheme at issue in *Zant,* Justice Stevens explained that the requirement for proof of specific aggravating factors is to genuinely narrow the class of persons eligible for the death penalty, and to reasonably justify the imposition of a more severe sentence for such defendants than upon others convicted of murder. *Zant,* 462 U.S. at 878–79, 103 S.Ct. at 2742–43, 77 L.Ed.2d at 249–50. Both the *Zant* and *Davis* opinions described the finding of specific aggravating factors as the "definition stage." *Zant,* 462 U.S. at 878–79, 103 S.Ct. at 2743–44, 77 L.Ed.2d at 250–51; *Davis,* 477 N.E.2d at 892–93. In this case the "definition stage" was passed when the jury and trial judge determined, and their conclusion is supported by substantial evidence, that defendant was guilty' of the murder of a law enforcement officer acting in the course of duty. I.C. § 35–50–2–9(b)(6)(i). Once the "definition stage" is passed, the *Zant* court explained that "the Constitution does not require the jury [or trial judge] to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." (Emphasis in original; citations and footnote omitted.) 462 U.S. at 878–79, 103 S.Ct. at 2743–44, 77 L.Ed.2d at 251. Applying these principles, the *Davis* Court found no error when the trial judge considered uncharged aggravating factors after the charged aggravating circumstances had been established. 477 N.E.2d at 893–94.

In light of these standards we turn to the factors argued in the instant case. The trial judge concluded defendant was not acting under the substantial domination

2. In invoking the rules for appellate review of sentences in this case we are cognizant of the concerns expressed by Justice Marshall (Brennan, J., concurring) dissenting to denial of certiorari in *Schiro v. Indiana* (1986), — U.S. ——, 106 S.Ct. 1247, 89 L.Ed.2d 355. Although the dissent's comments were particularly addressed to the situation where, as in *Schiro* but unlike this case, the trial judge overrides the jury's recommendation of a prison sentence and imposes the death penalty, the criticisms that our sentence review rules accord a substantial, if not conclusive, presumption to the trial court's decision, *see Schiro,* — U.S. at ——, 106 S.Ct. at 1248, 89 L.Ed.2d at 356, and that the "manifestly unreasonable" standard "effectively insulates the sentence from meaningful review," — U.S. at ——, 106 S.Ct. at 1249, 89 L.Ed.2d at 357, surely raise substantial questions that should be kept in mind in any death penalty case where we invoke these rules.

We respectfully suggest that as applied in our capital cases decided since the rules became effective in 1978, the rules stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision. Thus, in cases such as *Lowery,* 478 N.E.2d at 1230–32, *Averhart v. State* (1984), Ind., 470 N.E.2d 666, 695–97, *cert. denied* (1985), 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 323, *Resnover,* 460 N.E.2d at 935–36, *Daniels,* 453 N.E.2d at 172–74 and n. 3, and *Brewer v. State* (1981), 275 Ind. 338, 359–63 and n. 3, 417 N.E.2d 889, 900–03 and n. 3, *cert. denied* (1982), 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384, we have carefully considered whether, under all the circumstances, the death penalty has been arbitrarily or capriciously applied.

The primary purpose of the appellate sentence review rules is to provide an appropriate, albeit self-imposed, check on the authority of this Court and our Court of Appeals to revise or vacate sentences with which we simply disagree. *See generally, Fointno v. State* (1986), Ind., 487 N.E.2d 140, 144–46, *discussed infra; Cunningham v. State* (1984), Ind.App., 469 N.E.2d 1, 7–8, *trans. denied.* Although we are obliged to review death sentences with the most exacting scrutiny to ensure they are imposed in accordance with Constitutional standards, we read no majority opinion of the U.S. Supreme Court as *requiring* state appellate tribunals to make a *de novo* determination of sentence. The primary sentencing responsibility, even in capital cases, lies, as it should in our view, with the trial court. *See, Eddings,* 455 U.S. at 119, 102 S.Ct. at 879, 71 L.Ed.2d at 14 (O'Connor, J., concurring), and *id.,* 455 U.S. at 127–28, 102 S.Ct. at 883, 71 L.Ed.2d at 19 (Burger, C.J., dissenting).

of another person, i.e. Snyder, and that his judgment was not affected by an emotional disturbance or intoxication. The record supports the conclusion that Snyder and defendant were acting in concert until the marshal arrived, and that defendant acted alone in shooting. There is evidence defendant had been drinking, but he had the presence of mind to be driving from Fort Wayne to Avilla, to direct traffic at the scene, to flee after the shooting, to discuss the incident with his brother, to dispose of the flashlight and service revolver, and to later recall events surrounding the incident. Regarding any emotional disturbance, there is no probative evidence defendant was suffering from a mental or emotional disturbance that affected his ability to conform his conduct to law.

Defendant also emphasizes there was no advance plan or scheme to shoot the marshal. The significance of this factor is lessened because the defendant had time to deliberate the act and to consider other options, including flight from the scene.

Defendant particularly argues that the trial judge improperly considered his "silence," i.e. refusal to admit the crime, in aggravation. He cites *Griffin v. California* (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, *reh. denied* 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730. *Griffin* and its progeny have firmly established that a defendant's refusal to testify may not be considered to support an inference of *guilt,* not the propriety of a *sentence.* It is well established that the sentencer may consider lack of remorse as a factor in imposing sentence. *See, Gibbs v. State* (1984), Ind., 460 N.E.2d 1217, 1222; *Hoehn v. State* (1984), Ind.App., 472 N.E.2d 926, 932. Furthermore, defendant's failure to accept responsibility or show remorse properly could be considered against proffered mitigating testimony that he had cooperated with police in locating certain evidence and was capable of rehabilitation. The persistent failure to acknowledge the crime was regarded by the trial judge as showing defendant might act similarly if confronted with a difficult situation in the future.

Other evidence included a psychologist's assessment that, although defendant was capable of rehabilitation, he was a young man with poor social controls, who tended to be impulsive and was extremely susceptible to the influence of other people to a near pathological extent, though we again emphasize the record shows he was not dominated by Snyder in this incident. The record also included defendant's statements to the probation officer who prepared the pre-sentence report that he did not "like these charges," that the jury was "unfair," and that he would do "whatever I can to get out of it." Finally, on at least one occasion defendant stated to a cellmate, referring to the State Police Officer who had investigated the case and arrested him, that defendant "wished it would have been Officer Barrett that he'd shot instead of Bill Miner." Thus, the evidence regarding capacity for rehabilitation was, at best, inconclusive, and the trial judge properly considered defendant's lack of personal remorse as relevant to questions of rehabilitation and future dangerousness.

Defendant further complains that the trial judge unduly emphasized Marshal Miner's status as a police officer victim of a murder. However, the trial judge correctly observed that many persons otherwise willing to damage property or engage in violence will yield to the authority of a police officer, and that police officers are the "front line" against criminal assaults on society. These considerations illustrated the gravity of this crime. The weight given by the trial judge to the status of the victim, supported by the social policy considerations making this a statutory aggravating factor, was a matter properly within the judge's purview.

A comparison with two recent cases, one involving the death penalty, is helpful. In *Averhart,* 470 N.E.2d at 695–97, this Court upheld a death sentence where the defendant, who previously had been incarcerated for involuntary manslaughter, during the course of a robbery shot and killed a police officer who had already been wounded in the incident. The trial court considered the

proffered mitigating evidence, found no mitigating factors and sentenced the defendant to death. In *Fointno*, 487 N.E.2d at 143–49 (Givan, C.J. and Pivarnik, J., dissenting), the majority concluded that a total sentence of 104 years for rape, other sexual assaults, robbery and confinement was manifestly unreasonable in light of the defendant's good work record and no prior criminal history. The majority particularly noted that the trial judge had given no consideration to the mitigating evidence presented. In the instant case, unlike *Averhart* but as in *Fointno*, the defendant does not have a significant prior criminal history. However, unlike *Fointno* the record here reveals the trial judge gave thoughtful consideration to the mitigating evidence presented.

In *Fointno*, 487 N.E.2d at 145, the majority adopted the approach used by the Court of Appeals in *Cunningham*, 469 N.E.2d at 8, for applying Ind.R.App.Rev. Sent. 2. If upon initial review of the record the reviewing court determines the sentence may be manifestly unreasonable, the court should undertake a thorough analysis of all the factors in the record relevant to sentencing and then determine whether no reasonable person could find such sentence appropriate to the particular offense and offender.

In view of defendant's age and lack of prior criminal history we have assumed, *arguendo*, upon our initial review of the record, that the death sentence might be manifestly unreasonable. However, upon considering all the relevant factors present in this record, the jury's recommendation and the trial judge's carefully prepared memorandum, we cannot conclude that imposition of the death penalty in this case was arbitrary or capricious, or that no reasonable person could find such sentence appropriate to the particular offense and offender. Accordingly, imposition of the death penalty in this case was not contrary to law.

## CONCLUSION

Chief Justice Burger's comment that "[i]t can never be less than the most pain-ful of our duties to pass on capital cases, and the more so in a case such as this one[,]" *Eddings*, 455 U.S. at 127, 102 S.Ct. at 883, 71 L.Ed.2d at 19 (Burger, C.J., dissenting), surely applies here. Nevertheless, despite counsel's articulate and thorough presentation of defendant's contentions, our review of the transcript reveals that defendant was given a fair trial and provided with a vigorous defense. The jury's conclusion of guilt is sustained by substantial evidence. Furthermore, the jury deliberated for about seven hours before returning its death sentence recommendation, and Judge Puckett's sentencing memorandum admirably reveals thoughtful consideration of the factors relevant to the sentence. In sum, the conviction and imposition of capital punishment comport with Constitutional and statutory requirements as interpreted by the United States Supreme Court and by this Court.

The conviction and death sentence are affirmed, and this case is remanded to the Wayne Circuit Court, which is instructed to set a date for the death sentence to be carried out, and to conduct any further proceedings.

GIVAN, C.J., and PIVARNIK and SHEPARD, JJ., concur.

DeBRULER, J., concurs and dissents with separate opinion.

## APPENDIX

### COURT'S MEMORANDUM OF FINDINGS

The Court has adjudged that the death penalty be imposed in this cause. The Court's determination is based upon the following findings and reasoning which have been and are hereby ordered incorporated as part of the Court's judgment and sentencing.

#### I. *Aggravating Factor*

A. The evidence establishes and the Court finds beyond a reasonable doubt that

it was the defendant who killed Marshal Miner, the victim in this case.

1. The defendant contends that it was his original co-defendant, Snyder, who did the killing.

(a). The co-defendant Snyder testified to the contrary and his version corresponded to the details of the defendant's many admissions that he did the killing. Further, defendant's many admissions without any reasonable explanations as to why the admissions were made and no denial that they were, in fact, made, cannot be explained away except on the basis that it was the defendant who did the killing. In addition, the defendant has never presented the Court with his account of what occurred at the scene of the killing to give a basis for determining otherwise. The Court has discounted the testimony of some witnesses who testified at the trial who viewed the incident from several hundred feet away in the darkness on the basis that what they thought they saw did not correspond with the victim's wound being from the rear and downward. The evidence establishes the location and nature of the wound clearly and beyond a reasonable doubt as being a back wound with entry from the back and exiting in the front in a downward path.

(1) There has been the suggestion that all who heard defendant's admissions were lying and had some motivation to lie—but when consideration is given to the testimony of the brother of the defendant, the daughter of the brother's girlfriend, and those who were confined with the defendant, it is not likely that all of them were motivated to make up the admissions. In addition, the Court observed the witnesses at trial and finds that in fact they were not misstating or misrepresenting the admissions of the defendant.

2. There has been some suggestion that the defendant was acting out of fear or under the influence of co-defendant Snyder.

(a) However, in additional to evidence to the contrary above referred to, it does not make sense that the defendant if acting out of fear or influence would make any admission at all implicating the two.

(b) Or if so, more likely he would have excluded Snyder and included only himself.

(c) And in any event, it would appear ordinarily he would have replaced Snyder with himself in his story, not make up a new version. His contention has been that only one person fought and shot the victim, namely, Snyder; not one fought (Snyder) and the other shot (Spranger) as has been his version of the incident by his admission. Particularly is this true since he first implicated himself to his brother and the daughter of his brother's girlfriend soon after the incident and before he would have had time to think through an entirely different version of the incident.

B. Evidence in the case also establishes and the Court finds beyond a reasonable doubt that the killing was deliberate and intentional. In support of this conclusion:

1. The nature of the wound and the location and angle of the wound in the back reflect that the weapon would have been pointed and fired from behind and above the victim.

2. Statements that the defendant has made as to the way in which the killing was accomplished.

3. The defendant's comment at the scene, "I shot the bastard, lets get our [sic] of here."

4. The defendant's statement to his brother that it was like someone stepping inside him and doing the killing and then stepping back out, although perhaps intended to reflect some kind of psychological phenomenon, there is no basis in the evidence for such a psychological conclusion. Consequently, the statement tends to reflect primarily the deliberateness of the act.

5. There is no contention of accident and no suggestion in the defendant's version that the act was other than deliberate. Although he blames Snyder, there is no indication the shooter acted other than deliberately and intentionally.

C. The evidence also establishes and the Court finds beyond a reasonable doubt that the victim, Marshal Miner, was a law enforcement officer acting in the line and course of duty at the time of the killing.

D. Therefore, the abbravating [sic] factor, the murder of a law enforcement officer by the defendant in the course of duty, has been proven beyond a reasonable doubt and the Court finds that said aggravating factor has been proven beyond a reasonable doubt.

II. *Mitigating Factors*

A. The following are contended by the defendant to be mitigating factors:

1. Defendant's age.

2. Defendant's lack of record and violent history.

3. Defendant's state of intoxication at the time of the incident.

4. The defendant was acting under emotional or stressful situation.

5. The defendant engaged in no advance plan or scheme to kill.

6. The defendant is subject to rehabilitation.

7. The defendant is a worthwhile human being.

8. The defendant cooperated with authorities.

9. The co-defendant Snyder received a disproportionate sentence.

The Court finds with regard to mitigating factors as follows:

A. *Age*

1. The Defendant's youth certainly adds to the tragedy of this whole affair.

2. Youth can, in the proper circumstances, be a definite mitigating factor.

(a) But for one so young to be able to pick up a weapon and shoot a police officer in the back; an officer whom he knew; with no provocation other than that that existed in this case wherein a police officer was defending himself in a fracas that the evidence establishes had been provoked by the defendant and with the numerous alternatives with respect to use of a flashlight, the butt of the weapon, jumping the officer making it two on one, or exiting the scene—would seem more of a reflection of deficient character than the misjudgment of youth.

Youth under these circumstances becomes almost more aggravating than mitigating.

C. [sic] *Lack of Criminal Record and History of Violence*

1. This is a positive mitigating factor.

(a) It is depreciated, however, by the fact that because of age, lack of record, the comparative minor nature of the defendant's criminal act which brought the Marshal to the scene, make the killing even more aggravated and disproportionate when compared to the risk of the defendant from the standpoint of criminal punishment if he had submitted. Avoiding the situation by killing under all circumstances of this case deviates substantially from the response of the ordinary person in such a situation, even one inclined otherwise to act out in a criminal way.

D. There is no question that proper mitigating weight should be given when one is under the control of alcohol so that it is the alcohol and not the person which initiates a violent act.

1. The fact that there was consumption of alcohol which clouded judgment, however, is not a proper mitigating factor. Few crimes are committed without some consumption of alcohol or other drug.

(a) Here the evidence does not support a conclusion that the defendant was so drunk that his act was the result of alcohol as opposed to his inclination to act out in violence.

(1) The defendant was able to function before, during, and after the incident. For example, he operated his motor vehicle, although at times at excessive speeds, without indication such was erratic or out of control.

(b) He directed traffic at the scene and indicated to at least one passerby that everything was all right, thereby diverting

them from assisting the Marshall in difficulty.

(c) He sought the solace of his brother immediately after the incident and was able to recount the event.

(d) On later occasions he remembered and disclosed the event in great detail.

(e) He got rid of the weapon and later led law enforcement to where they could find the weapon in a lake near where his brother lived.

2. Intoxication is not a mitigating factor here.

E. *The Defendant Acted Under Great Emotional Stress*

1. The entire situation which culminated in the Marshal's killing was provoked by the defendant's own conduct.

2. The act of killing, as already mentioned, is disproportionate to the total situation; the fact that he killed a law enforcement officer attempting to do his duty; the fact the law enforcement officer was known to the defendant; and the fact that there were other alternatives. The response to this situation reveals more defective character than a reasonable, even youthful reaction to stress.

F. *No Advance Plan or Scheme*

1. It is true that the defendant did not plan in advance to kill the officer.

2. This is not a situation, however, wherein the defendant was surprised in the course of criminal action and immediately over-reacted.

3. The defendant had time to think. He deliberately picked up the gun and deliberately shot the officer in the back.

G. *The defendant cooperated with authorities*

The Court recognizes that the defendant cooperated with law enforcement officers as far as locating the weapon once he was apprehended. He had taken flight from the scene to avoid apprehension and detention and the evidence would indicate had his brother not informed law enforcement of defendant's admissions to him, the defendant would not have come forward. At least he did not voluntarily surrender himself, but had to be sought out and apprehended.

H. *The defendant is a worthwhile individual and can be rehabilitated*

These factors are discussed together as they are fundamentally related.

1. The Court does not discount that the defendant is worthwhile as a human being. At his age there are prospects for rehabilitation.

2. However, it is difficult to assess a defendant's attitude and his likelihood of repeating his violent acting out, when a defendant persists in denying crime when the evidence shows that he committed the crime.

3. In psychological terms, he is an antisocial, impulsive type personality. Experience has shown the Court that this type of personality is difficult to change and to guide.

4. His pattern in the killing; his pattern in this case is strongly indicative that he will do what is necessary to avoid a difficult situation, whatever the costs to others. His comment to the probation officer, "I don't like these charges. I think it was an unfair jury. I'm going to do whatever I can to get out of it," is perhaps indicative of his approach to a difficult situation. As in this case wherein he acted disproportionately to the risk and possible inconvenience to himself to avoid submission to the law, the indication is he will do what is necessary when threatened.

5. He personally has given the Court little. His demonstration of remorse or contriteness or straightforwardness to dispel a feeling that if a similar situation such as that in this case arose, he would necessarily act out in a different manner has been limited.

6. He has avoided in the sentencing phase a detailed account of his version of the incident so that the Court might have a basis to test his version against what otherwise is overwhelming evidence to the contrary. Even if he persisted in his position

that the co-defendant did it, the defendant could have recounted his version in some detail. The fact that he avoided doing so further supports a conclusion that his position is not supportable and would not stand up if effort were made to present it in detail.

7. The unwillingness of the defendant to be as open as possible with the Court, in light of a senseless killing, limits the Court's ability to indulge in a presumption that one so young would not repeat. And it certainly deprives the Court of a humane and feeling response to form a basis for a more merciful determination in light of such a tragic result in the total context of the case. If there was ever a need to open up, to be honest, and let everything out, this was it. And it did not happen.

I. *The co-defendant Snyder's sentence was disproportionate*

Under the law, Snyder could not have received the death penalty in all probability, being the non-trigger man, so to speak, nor would the evidence indicate that he encouraged or induced the killing. Without going into greater detail, in all probability the facts as disclosed by the evidence would well have led to Snyder's conviction of that which he pled to and certainly there is sufficient probability to have allowed room for the Prosecutor to have made the judgment that the Prosecutor made with regard to Snyder. Because of this, the fact that the co-defendant received different treatment is not a mitigating factor.

J. Finally, the Court finds that other possible mitigating factors specifically mentioned in the applicable statute (*I.C. 35–50–2–9*) although not contended by the defendant to be present in this case, are not established by the evidence:

1. The victim had not participated in, consented to or provoked the defendant's conduct.

2. The defendant's participation was not relatively minor, as already indicated above.

3. The defendant did not act under substantial domination of Snyder or any other in committing the crime.

4. The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired as a result of mental disease, or defect, or intoxication.

III. *Weighing Aggravating and Mitigating Factors*

The Court finds:

A. The aggravating factor—the of the murder of a law enforcement officer, is deserving of special weight in the context here not only because of the vulnerability of law enforcement officers who are, without question, the front line of defense in the community in protecting against crime and violence; and also because an attack on such an officer, as a representative of the community, is a more direct attack on members of the community than other killings, and because, too, the law enforcement officer is a symbol of authority and order.

1. One who is able to attack such an officer—a representative of the authority of the community—represents a different level of violent acting out than do many others. Even one ordinarily bent on combatingness in other confrontations will ordinarily submit to the authority of the community and the law.

B. The aggravating factor is especially aggravated, too, in the particular factual situation in this case. Perhaps it is the incident which would appear least threatening to an officer which increases an officer's vulnerability. This case is an example. The officer may have recognized the defendant ("Hi there, I'm Billy Spranger, you know me") or the appearance of vandalism, serious but not very serious on a comparative basis, or the combination in all probability caused the Marshal to lower his guard, turn his back, and his death followed.

C. The senselessness of the killing already eluded [sic] to makes the aggravating factor here especially aggravating.

D. In addition, the whole pattern of conduct of the defendant on the night in question indicated an attitude of total disrespect and lack of caring for property (the Mustang incident, not only items stolen from the Mustang but actually apparently an intent to destroy it so that no one could get any benefit from it, for no reason other than to be destructive) and, of course, a total disrespect for the person of the victim in this cause.

The possible mitigating factors which have been discussed in detail when, in context, are weighed against the aggravating factor, in context, causes the Court to find and conclude beyond a reasonable doubt the aggravating factor outweighs the possible mitigating factors. (The use of beyond a reasonable doubt is to indicate an expression of certainty, although the Court does not believe in this weighing and judgmental process that this is an appropriate test).

IV. The question remains whether in any event the death penalty should be imposed.

A. Contention is made that this sentence would be generally disproportionate to other death penalty cases in the State of Indiana.

1. The United States Supreme Court appears to have created by decisions in the last several years a framework in which the states are permitted to establish their own standards as to employment of the death penalty provided the aggravating circumstances required at a minimum are reasonably prescribed and sufficiently proscribed; and provided that a state is consistent in similar factual situations in employing or not employing the death penalty; and further provided legal procedures are adopted to assure a studied approach wherein all possible mitigating factors are considered rather than an arbitrary, capricious and emotional approach to the imposition of the death penalty.

In recent cases, the Indiana Supreme Court had decided that age, as young or younger than this defendant, of lack of prior record will not deter the death penalty if otherwise the act and the particular circumstances of the case are serious enough.

2. In part the proportionate-disproportionate determination rests upon the judgment of whether the deliberate and senseless killing of a law enforcement officer in the line of duty under the circumstances of this case is of sufficient degree to put it on a par with other killings perhaps more heinous in the manner in which the act of killing itself is carried out—multiple stabbings for example as in a recent case in which the death penalty was imposed and upheld.

This Court places the act in the context of this case on that plane and finds it to be sufficient to support the death penalty. The Indiana Supreme Court will, of course, make the ultimate decision in this regard; and is in a better position actually to survey all that has passed before it than is the trial court.

3. The determination to be made here focuses, as do all death penalty cases, but perhaps this one more than many, upon the conflict which necessarily exists in this area:

(a) On one hand is the importance we place on individual life and particularly young life and our recognition of the frailty of homan [sic] nature—there is absolutely no question we are all more deficient than we care to admit and the difference between the best and worst of us, however measured in human terms, is miniscule when measured on any absolute scale.

Recognition, too, must be given that however impoverished is our human character, each of us can change, if by no other means, than at least by religious conversion. Rehabilitation can never be totally discounted.

(b) But, on the other hand, in this area is the importance of the protection of society by deterrence of acts of violence not only

directly on the basis that if death comes to some through the system others will be convinced not to commit similar acts (and the debate goes on as to the full extent of the deterrent effect); but also less directly, but perhaps more effectively, as a means of expression of the repulsion of the community at large by acts of violence, and a part of the tightening of the fabric of society and a reflection of the increasing demand that senseless violence must cease.

And, too, from a societal protection standpoint, if outrage and utter exasperation exists with regard to senseless violence—which it does—is the increased importance of a system which is responsive, both actually and by appearance, to calm fear and to reveal a viable and generally accepted alternative to self help.

4. I do not believe anyone is fully capable of making this kind of life-death; individual-societal choice presented in a case of this nature. For one thing, the choice is never black and white. For example, no matter what might be said about society's protection by use of the death penalty, it is important to society that neither the community nor the system be so rigid, so hard, so inflexible that appropriate compassion and attention to the human condition is eliminated. If it is, the quality of life in the society is depreciated and the community ultimately suffers.

5. In making the final determination here, the Court has looked at all we have commented on and has looked carefully, as the Court told the jury in this case it would; at the jury's recommendation. The Court receives this case in a slightly different posture than did the jury. The applicable statute requires that the Court among all other factors consider the jury's recommendation.

A. In evaluating the jury's recommendation, the Court first looked at the membership and the make up of the jury. The process of jury selection was slow, painstaking, and careful. This was not a death-oriented jury. In fact, in the opinion of the Court, this jury was disinclined generally toward death.

B. The jury's decision was a thougtful [sic] non-emotional determination.

C. The United States Supreme Court has recognized that juries can be a reliable index of contemporary values as they relate to the employment of the death penalty generally and the Court believes a proper jury in a particular case can be a reliable index of those values in a given factual situation.

The jury in this case has determined that this senseless killing of a law enforcement officer under all the facts and circumstances of this case warrants the death penalty.

6. In final analysis, with all other considerations mentioned, the Court is persuaded by the jury's recommendation and accepts it. It is the Court's recommendation as well.

Therefore, based on all the foregoing, it has been adjudged that the defendant suffer the death penalty in the manner provided by law.

DeBRULER, Justice, concurring and dissenting:

The trial court must find that the state has proven that the aggravating circumstance exists beyond a reasonable doubt. In addition, the trial court must find that the defendant intentionally killed the victim.

The aggravating circumstances here was that " ... the victim of the murder was a ... law enforcement officer ... acting in the course of duty ..." I.C. § 35–50–2–9(b)(6). Under 35–41–1–2 (Burns 1979 suppl.; now 35–41–1–17 as added by P.L. 311–1983, § 18), "Law enforcement officer means."

(1) A police officer, sheriff; constable, marshal, or prosecuting attorney:

(2) A deputy of any of those persons; or

(3) An investigator for a prosecuting attorney.

I hasten to point out that appellant has not challenged the sufficiency of evidence of the aggravating circumstance. However, it is appropriate to consider such issues *sua sponte* in a death case.

The victim's status as the Town Marshal of Avilla was established by the testimony of the President of the Avilla Town Board. Consequently, the victim was a law enforcement officer. However, the attempted arrest of the perpetrators and the subsequent killing of the Town Marshal occurred outside the town limits of Avilla.

Was the victim acting in the course of duty when the law enforcement action occurred outside the town limits? The powers and duties of a Town Marshal are set forth in I.C. § 36-5-7-4.

36-5-7-4. Powers and duties,—The marshal is the chief police officer of the town and has the powers of law enforcement officers in executing the orders of the legislative body and enforcing laws. The marshal or his deputy:

(1) Shall serve all process directed to him by the town court or legislative body:

(2) Shall arrest without process all persons who commit an offense within his view, take them before a court having jurisdiction, and detain them in custody until the cause of the arrest has been investigated;

(3) Shall suppress breaches of the peace;

(4) May, if necessary, call the power of the town to his aid;

(5) May execute search warrants and arrest warrants; and

(6) May pursue and jail persons who commit an offense. [I.C. 18-3-1-20, 18-3-1-32, recodified as I.C. 36-5-7-4 by Acts 1980, P.L. 212, § 4.]

In *Warner v. State* (1980), Ind.App., 406 N.E.2d 971, the Second District of the Court of Appeals construed the former statute I.C. § 18-3-1-32 which delineated the powers and duties of a town marshal.

18-3-1-32 [48-213]. Marshal-Powers and duties. In executing the orders of the town trustees and enforcing the ordinances of the town and the laws of the state, the marshal or duly appointed deputy marshal *shall possess all the common-law and statutory powers of constables,* except in relation to the service of civil process; and any warrant of search or arrest, issued by any judge, or

magistrate, or justice of the peace of this state, may be executed in any part thereof by the marshal or deputy marshal subject to the laws of this state governing arrest and bail. The marshal or deputy marshal shall have the power, and it shall be their duty, to serve all process issuing from the town court. They shall be conservators of the peace in the town, and shall arrest, without process, all persons who within their view commit any crime or misdemeanor contrary to the statutes of this state or ordinances of the town, and take them before the court having jurisdiction of the offense with which the person is charged and retain them in custody until the cause of such arrest has been investigated, and shall suppress all breaches of the peace within their knowledge. Authority is hereby given for them to call to their aid the power of the town and to pursue and commit to jail all felons, persons guilty of misdemeanors or crimes in violation of the statutes of this state or the ordinances of the town. The marshal shall have the power, and it shall be his duty to serve all process issued by the town board of trustees. [Acts 1969, ch. 257, § 305, p. 987.]

17-4-36-5 [49-3407]. Acts throughout county-Citizens to aid. Constables in the discharge of their duty, shall have power to act throughout their respective counties, unless specially restrained by law, and whenever necessary, may call upon any number of citizens to assist them in the discharge of their duties, who shall not refuse such assistance under such penalty as may be prescribed by the criminal law. [2 R.S. 1852, ch. 2, § 6, p. 480].

After examining these statutes, the Court of Appeals concluded, "And, in this regard, since constables 'have the power to act throughout their respective counties, I.C. § 17-4-36-5, a fortiori town marshals have the power to effect an arrest throughout the county in which their respective towns are located. *Warner v. State, supra at 972.* I.C. § 36-5-7-4 replaced I.C. § 18-3-

1–32 in 1980, and it was the applicable statute at the time of this offense which occurred in 1983. The phrase "the marshal ... shall possess all the common-law and statutory powers of constables" contained in I.C. § 18–3–1–32 is absent from I.C. § 36–5–7–4. A change in legislative purpose will be presumed from a change in the wording of a statute. See *State v. Beal* (1916), 185 Ind. 192, 113 N.E. 225; *Hasely v. Ensley* (1907), 40 Ind.App. 598, 82 N.E. 809, 26 I.L.E. Statutes § 161.

There is a presumption that a statutory amendment was intended to change existing law. *Ware v. State* (1982), Ind.App., 441 N.E.2d 20; *Gingerich v. State* (1950), 228 Ind. 440, 93 N.E.2d 180. There is nothing to suggest that the omission of the key phrase "the Marshal ... shall possess all the common law and statutory powers of constables" meant anything else but that the town marshal's authority was being limited to the boundaries of the town except in the case of pursuit (see I.C. § 36–5–7–4(6)). Moreover, it cannot be said that the legislature adopted the construction of *Warner v. State*, supra, because the legislature omitted the phrase that *Warner* construed and because the Court of Appeals handed down *Warner* one month after the legislature passed I.C. § 36–5–7–4. There is another rule of construction which leads us to this same conclusion.

"It is a fundamental rule in the construction of statutes that penal statutes must be construed strictly, or, as is otherwise stated, strictly construed against the state. The rule of strict construction means that such statutes will not be enlarged by implication or intendment beyond the fair meaning of the language used, and will not be held to include offenses and persons other than those which are clearly described and provided for although the court may think the legislature should have made them more comprehensive." *Kelly v. State* (1954), 233 Ind. 294, 298, 119 N.E.2d 322, 324. Although I.C. § 36–5–7–4 is not a penal or criminal statute, it does give content to a criminal statute, specifically I.C. § 35–50–2–9(b)(6), and its construction is decisive in this case as to whether the State proved the aggravating circumstance beyond a reasonable doubt. Consequently, it must be strictly construed against the state.

In *Warner*, the Court of Appeals also relied on I.C. § 35–1–21–1 for authority that a Town Marshal could arrest someone anywhere in the county. I.C. § 35–1–21–1 (Burns Code Ed., Supp.1978) provides:

All judges, coroners, and law enforcement officers may arrest and detain any person found violating any statute of this state, until a legal warrant can be obtained [Acts 1905, ch. 169, § 142, p. 584; 1978, P.L. 2, § 3514, p. 597.]

The Court of Appeals construed this statute to give " ... law enforcement officers the authority to arrest at any place within the state ...". However, this construction is illogical when I.C. § 17–4–36–5 specifically limits constables' powers of arrest to their respective counties. (Through I.C. § 18–3–1–32 Town Marshals were also limited to their respective counties). *Nevertheless, I.C. § 35–1–21–1 was replaced by I.C. § 35–33–1–1 in 1981.* The content of I.C. § 35–33–1–1 concerns *when* an officer may arrest and not *where*.

The majority relies on *State v. Russ* (1985), Ind.App., 480 N.E.2d 248 to support its position that the powers of law enforcement officers to arrest are not given territorial limitation. The Court of Appeals in *Russ* reasoned that since I.C. § 35–33–1–1 and I.C. § 34–4–32–2 do not state any jurisdictional limitations, there must be none. First, the obvious reason these statutes do not contain any jurisdictional limitations is because they refer to law enforcement officers in general and because they concern *when* they can arrest, not *where*. The specific jurisdictional limitations are contained in the statutes which designate the territorial jurisdiction of local governmental units. See I.C. § 36–1–3–9 and I.C. § 36–1–2–11.

It is an unreasonable construction to conclude that an officer of a particular local governmental unit has the power to act outside that unit in the absence of express

statutory authorization. I.C. § 35–33–1–1 and I.C. § 34–4–32–2, when viewed in this context, only grant powers to be exercised within the territorial jurisdiction of the appropriate local governmental unit. Again the strict construction doctrine leads to the conclusion, that a town marshal does not have the power to arrest outside of his town limits unless he is in pursuit of a perpetrator who committed an offense within the town limits.

The evidence supporting the aggravating circumstance is as follows: the victim, William Miner, was the Town Marshal of Avilla, Indiana. Under an arrangement with the Noble County Sheriff, his duties encompassed responding to any call in the area. On May 28, 1983, he responded to a call concerning an automobile being vandalized. The location of the offense was outside the town limits of Avilla. He attempted to arrest the perpetrators, and appellant intentionally shot and killed him.

This evidence is insufficient to support the existence of the aggravating circumstance because there is no evidence that the Town Marshal had been deputized by the Noble County Sheriff. See I.C. § 36–2–16–2(b) (Oath of office), I.C. § 36–2–16–3 (Power and duties) I.C. § 36–2–16–6 (Sheriff's deputies), I.C. § 36–8–10–6 (Appointment of additional deputies or assistants in emergencies), I.C. § 36–8–10–9 (Powers and duties of sheriff's department), I.C. § 36–8–10–10.5 (Special deputies). The fact that an arrangement existed between the town Board and the Noble County Sheriff's Department is not evidence which would lead a reasonable trier of fact to find beyond a reasonable doubt that the Town Marshal was a duly appointed sheriff's deputy acting within the course of duty involved therein.

## II

I.C. § 35–50–2–9(e) (Jury trial) and I.C. § 35–50–2–9(g) (Bench trial) set forth what the trial court must find before it can impose a death sentence:

That the State has proved beyond a reasonable doubt that at least one aggravating circumstance exists; and

That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

Once the trial court finds that the State has proved beyond a reasonable doubt that at least one aggravating circumstance exists, it must engage in the most critical stage of the death sentence determination: the weighing of mitigating circumstances and aggravating circumstances. He must find and assign a value to all mitigating circumstances which exist, and then he must place the weighted mitigating circumstances, if any, on the mitigating side of the scale. Next, he must assign a value to the aggravating circumstance or circumstances, and then he must place the weighted aggravating circumstance or circumstances on the aggravating side of the scale. Only if the mitigating side of the scale is outweighed by the aggravating side of the scale can a death sentence be imposed.

The separation of the valuations of the mitigating and the aggravating circumstances is crucial. The separate valuation of the mitigating circumstances must be maintained so that the trial court will be able to view the defendant in his best light, undistorted at that moment by the impact of the aggravating circumstances. In this way, defendant's worth as a human being can be fairly valued to the extent that such a valuation is humanly possible.

The separation of the valuations in this case is not maintained; consequently, it cannot be said that the valuation of the mitigating circumstances was not distorted by the impact of the aggravating circumstance. The sentencing statement gives rise to the inference that the aggravating circumstance did distort the valuation of the mitigating circumstances of lack of a significant history of criminal conduct, and youth.

The trial court alluded to the following mitigating circumstances: age, lack of a significant history of prior criminal conduct

I.C. § 35–50–2–9(c)(1), state of intoxication at the time of the offense, acting under an emotional or stressful situation, no advance plan or scheme to kill, cooperation with authorities, prospects for rehabilitation.

In dealing with appellant's lack of a significant history of prior criminal conduct, the trial court reasoned as follows:

"This is a positive mitigating factor." "It is depreciated, however, by the fact that because of age, lack of record, the comparative minor nature of the defendant's criminal act which brought the Marshal to the scene, make the killing even more aggravated and disproportionate when compared to the risk of the defendant from the standpoint of criminal punishment if he had submitted. Avoiding the situation by killing under all circumstances of this case deviates substantially from the response of the ordinary person in such a situation, even one inclined otherwise to act out in a criminal way"

The reasons given to depreciate this mitigating circumstance are irrelevant to the determination that this particular mitigating circumstance exists and to the determination of the weight to be given it. This mitigating circumstance is established by the actual absence of a significant history of prior criminal conduct. The weight to be assigned this circumstance must take into account the type, if any, of prior criminal conduct and be diminished accordingly, otherwise this mitigating circumstance should be given its full appropriate value and added to any other mitigating circumstances, and then it can be balanced against the aggravating circumstances that are proven beyond a reasonable doubt to exist. In so far as an aggravating circumstance impacts on the value of a mitigating circumstance, it does so when they are weighed together, not when the initial value of the mitigating circumstance is being determined.

Here, the trial court diminishes the value of this mitigating circumstance with criminal conduct, including the killing, that occurred at the time of the instant offense.

This was improper, and it gives rise to an inference that this mitigating circumstance was not given any weight in the most critical stage when the aggravating circumstances were weighed against the mitigating circumstances.

In dealing with appellant's age, the trial court reasoned as follows:

"The Defendant's youth certainly adds to the tragedy of this whole affair.

Youth can, in the proper circumstances, be a definite mitigating factor ...

But for one so young to be able to pick up a weapon and shoot a police officer in the back; an officer who he knew; with no provocation other than that that existed in this case wherein a police officer was defending himself in a fracas that the evidence establishes had been provoked by the defendant and with numerous alternatives with respect to use of a flashlight, the butt of the weapon, jumping the officer making two on one, or exiting the scene ... would seem more of a reflection of deficient character than the misjudgment of youth.

Youth under these circumstances becomes almost more aggravating than mitigating."

Youth's status as a mitigating circumstance has been recognized by the United States Supreme Court, *Robert v. Louisiana* (1977), 431 U.S. 633, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637, and it would fall under I.C. § 35–50–2–9(c)(7). The rationale which supports youth's status as a mitigating circumstance is a corollary to the general view that criminal liability is premised on rational actors who make blameworthy choices and who are thus responsible for the consequences of their acts. Immaturity is presumed to diminish the rational capacity of the criminal actor, and thereby lessens his moral culpability for criminal acts. Furthermore, responsibility for youthful misconduct may be widely distributed because the obligations to socialize, to educate young persons, and to teach them moral values and respect for the law, are shared by their families and communities. Another reason for youth's status as a

mitigating circumstance is that youths are more susceptible to rehabilitation.

The weight to be assigned this mitigating circumstance must take into account the offender's mental and physical development, education, and prior pertinent life experiences which shed light on whether the offender is the type of rational actor that the criminal law deems fully responsible for his actions.

Here, appellant was eighteen years old at the time of the offense. The trial court did not consider appellant's physical and mental development. The trial court did not consider appellant's educational background. The pre-sentence report reveals that he completed the eighth grade. The trial court did not surface any pertinent life experiences i.e. did he have experience with firearms?, was he living away from home and supporting himself?

The factors which the trial court used to discount youth as a mitigating circumstance do not support the trial courts implicit conclusion that this mitigating circumstance has no value in this case. The picking up of a revolver and shooting the police officer when he had ample time to escape does not support the inference that appellant's action was not the result of the misjudgment of youth. Rather, given the excitement of the arrest and the fight, the relatively instantaneous act of shooting with little time for deliberation, the gross disproportion of the means appellant used to effectuate his escape as compared to the offense for which appellant was initially stopped, and the fact that appellant returned home to his family, it is clear that the misjudgment of youth played a role in the killing. The trial court erred in not giving this mitigating circumstance substantial value.

The valuation of the aggravating circumstance in this case is also flawed. The aggravating circumstance here is that "... the victim of the murder was a ... law enforcement officer acting in the course of duty ..." I.C. § 35–50–2–9(b)(6). The trial court stated that this aggravating cir-

cumstance is deserving of "special weight". To support this conclusion, the trial court discusses the vulnerability of law enforcement officers in the course of duty and the law enforcement officer's representation of the community, authority and order. He further discusses that one who kills a law enforcement officer represents a more dangerous level of violence than do many others. These reasons are legislative policy considerations which account for the existence of the aggravating circumstance in the statute at all. They are not proper considerations to give added or "special" weight to the aggravating circumstance. The manner, the motivation, and other attendant circumstances of the offense are the type of considerations which may augment the value of this aggravating circumstance. The trial court also used two other considerations to support its conclusion that this aggravating circumstance deserves "special weight." First, the senselessness of the killing: it is true that all murders are senseless, but this murder was no more senseless than the many other murders which occur. The fact that murder can be a capital offense reflects a judgment on the part of the legislature that murders are senseless; however, the fact that the murder of the officer here was senseless does not provide a rational basis for giving this aggravating circumstance "special weight." Finally, the trial court deemed that this aggravating circumstance should have "special weight" because appellant committed the murder during the commission of a minor offense which might have caused the officer to lower his guard. This is a proper consideration to augment the weight of the aggravating circumstance due to its status as one of the attendant circumstances of the offense; however, there is some question as to whether this consideration would promote this aggravating circumstance to the level of "special weight" if it could be determined what "special weight" is. Nevertheless, the valuation of this aggravating circumstance contains improper considerations; there-

fore, it is impossible to tell whether it outweighed the mitigating circumstances.

The trial court's actual weighing of the mitigating and aggravating circumstance is but one more example of the unreliability of the death sentence determination in this case.

> "The possible mitigating factors which have been discussed in detail when, in context, are weighed against the aggravating factor, in context, causes the Court to find and conclude beyond a reasonable doubt the aggravating factor outweighs the possible mitigating factors."

The use of the word "possible" to modify the word "mitigating" gives rise to two inferences. The first inference is that the trial court did not find that any mitigating circumstances existed. Given the trial Court's disposition of the mitigating circumstances, this may have been what the trial court meant. If it was, then the trial court erred because there was certainly evidence in the record to support the existence of several mitigating circumstances. The second inference is that the trial court assumed that all the mitigating circumstances presented by the appellant contained their full possible value, but nevertheless were outweighed by the aggravating circumstance. Given the mitigating circumstances presented, this is tantamount to concluding that no quantity or quality of mitigating circumstances could equal the weight of this "special" aggravating circumstance. If this is the case, the trial court's action is the equivalent of a mandatory death sentence for the murder of a law enforcement officer which in its statutory form was held unconstitutional in *Roberts v. Louisiana,* supra; see also *Woodson v. North Carolina* (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944.

Having reviewed this sentence pursuant to Article 7, § 4 of the Indiana Constitution I judge that it is manifestly unreasonable and would order it reversed to a sentence of imprisonment appropriate to the crime of murder.